815 P.2d 1034

John GUBLER and Kellie Gubler, husband and wife, individually and as parents and guardians of John K. (Jake) Gubler, their minor child, Plaintiff-Appellants,

v.

Roger W. BOE, M.D., and Pocatello Children and Adolescent Clinic, P.A., Defendant-Respondents.

No. 18262.

Supreme Court of Idaho,
Boise Term, November 1990.

July 26, 1991.

Jenkins Law Office, Idaho Falls, and Kussman & Whitehill, Los Angeles, Cal., for appellants. Russell S. Kussman argued.

Hall, Farley, Oberrecht & Blanton, Boise, for respondents. Richard E. Hall argued.

BAKES, Chief Justice.

The plaintiff-appellants, John and Kellie Gubler, brought a medical malpractice action against the defendant-respondents, Dr. Roger Boe and the Pocatello Children and Adolescent Clinic, P.A., a professional association, for failure to detect and treat a urinary tract infection and urinary tract obstruction in their newborn child, Jake Gubler. The district court ruled that the Gublers' expert witness, Dr. Tune, had not familiarized himself with the standard of care in the Pocatello "community" during 1983 and therefore, under I.C. § 6–1012, he was unqualified to testify as to Dr. Boe's alleged breach of that standard of care. The district court, after once delaying the trial, refused a request for an additional continuance for Dr. Tune to further try to qualify himself and, on defendants' motion, the court entered an order of dismissal. The district court also denied the Gublers' motion for a new trial. Plaintiffs appealed. We affirm the judgment of the district court.

The child, Jake, was treated during 1983 by Dr. Boe in Pocatello, Idaho. Jake was hospitalized for pneumonia and was being treated by Dr. Boe. He apparently was also suffering from a urinary tract infection and obstruction which went undetected for six months, leading to severe, acute renal failure and a loss of the kidney function. On April 22, 1986, the Gublers filed a complaint against Dr. Boe alleging medical malpractice.

At trial the Gublers called Dr. Bruce Tune as their expert witness on the question of liability. Dr. Tune was questioned on both direct and cross examination to determine whether he had adequately familiarized himself with the applicable standard of health care practice in existence at the time and place of the alleged negligence of the defendant. Dr. Tune testified that in late 1988 he spoke to Dr. Groberg, a board-certified obstetrician practicing in Idaho Falls, Idaho, who informed him that there was no local deviation from the national standard of care in treating urinary tract infections and obstructions.[1] However, Dr. Tune's testimony indicates the discussion between the doctors did not make reference to the standard of care in 1983 when Jake Gubler was treated by Dr. Boe. Therefore, the district court excluded the testimony of Dr. Tune regarding standard of care because he failed to meet the time specificity requirement of I.C. § 6–1012. The court further noted that the Gublers failed to make any showing to the court as to Dr. Groberg's familiarity with the standard of care in the Pocatello, Idaho, "community" in 1983 or whether Dr. Groberg was even practicing in Idaho at that time.

Having failed to qualify Dr. Tune, the Gublers' counsel requested leave to recall the defendant Dr. Boe, whom they had earlier called as a witness, in an attempt to establish the applicable standard of care and breach of that standard through the defendant's own testimony. The court denied the request because the Gublers had previously examined Dr. Boe at length earlier in the trial and did not reserve the right to recall him. The Gublers then requested a continuance of the trial to make a second attempt to recontact Dr. Groberg or some other doctor who could familiarize Dr. Tune with the standard of care in 1983. The court also denied this request for continuance.

The defendants then moved for summary judgment or an order of dismissal based on the Gublers' failure to present the statutorily required evidence that Dr. Boe's conduct violated the Pocatello "community" standard of care. The trial court granted the motion to dismiss, because the Gublers were not prepared to put on any other

1. Idaho Falls, Idaho, is approximately fifty miles northeast of Pocatello, and is served by its own general hospital. Thus, Idaho Falls would be a separate "community" from Pocatello as the term "community" is defined in I.C. § 6–1012.

**296**

evidence to establish that Dr. Boe had violated the community standard of care. The Gublers' remaining witnesses were only prepared to testify as to damages or causation, and the court reasoned that it would be an exercise in futility to allow the plaintiffs to present damages evidence when they had not made out a *prima facie* case of liability.

The Gublers filed a motion for a new trial, which the district court denied finding that neither Rule 59(a) nor (e) entitled them to a new trial. The Gublers appeal from this order.

On appeal the Gubler's assert that the trial court erred (1) by failing to grant them a continuance to allow Dr. Tune more time to recontact Dr. Groberg; (2) by concluding that the combined testimony of Dr. Tune and Dr. Boe did not establish the local standard of care; (3) by not allowing Dr. Tune to testify on fact issues relating to Jake's palpable bladder and urinalysis; and (4) by not allowing them to recall Dr. Boe.

■ We first consider whether the district court erred in denying the Gubler's motion for a continuance. This Court has previously stated that a motion for a continuance is within the discretion of the trial court, and that the trial court's ruling on such a motion will not be overruled absent an abuse of discretion. *Pauley v. Salmon River Lumber Co.*, 74 Idaho 483, 264 P.2d 466 (1953).

After several months of discovery, and three days of trial, it became apparent to the trial court that plaintiffs' only designated expert witness, Dr. Tune, had not familiarized himself with the local community standard of practice in Pocatello, Idaho, in 1983, as required by I.C. § 6–1012 [2] and our prior cases. *Strode v. Lenzi*, 116 Idaho 214, 775 P.2d 106 (1989) (out-of-state orthopedic surgeon was not competent to testify

concerning applicable standard of care to orthopedic surgeon practicing in-state without first demonstrating that he possessed actual knowledge of applicable community standard); *Dekker v. Magic Valley Reg. Medical Center*, 115 Idaho 332, 766 P.2d 1213 (1988); *Buck v. St. Clair*, 108 Idaho 743, 702 P.2d 781 (1985). The statute is both site and time specific. The court excluded Dr. Tune's testimony based on his "total failure" to establish the standard of care not only at the time of his conversation with Dr. Groberg in 1988, but also five years earlier at the time of Dr. Boe's care and treatment of Jake Gubler.

At the request of plaintiffs, the trial court delayed the proceedings to allow Dr. Tune an opportunity to re-contact Dr. Groberg, or any other doctor, in an attempt to familiarize Dr. Tune with the local community standard of care. However, Dr. Tune was unable to reach Dr. Groberg. Plaintiffs made another attempt to contact Dr. Groberg during a subsequent recess and again failed and were unable to qualify Dr. Tune as an expert witness.

Subsequently, plaintiffs' counsel requested a continuance of the trial to attempt to qualify Dr. Tune by contacting Dr. Groberg or some other unspecified doctor. The trial court denied this motion because (1) the motion and supporting affidavit of plaintiffs' counsel did not provide any assurances that Dr. Tune could even contact Dr. Groberg; (2) plaintiffs' counsel did not demonstrate that Dr. Groberg was familiar with the standard of care in Pocatello in 1983 or that he was even practicing in Idaho at the time; and (3) of the probability that defense counsel would need to redepose Dr. Tune prior to resumption of trial. With these factors in mind, the district court stated, "From the Court's perspective, plaintiffs' counsel failed to adequately prepare Dr. Tune to testify as to the appro-

---

**2.** Idaho Code § 6–1012 reads in part: "[C]laimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly

was or should have been provided, as such standard existed at the time and place of the alleged negligence of such physician and surgeon.... [T]he term 'community' refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided."

priate standard of care," and consequently denied the motion for a continuance. The district court observed that the plaintiffs' motion for a continuance did not demonstrate that, even given the continuance, they would be able to qualify their expert to testify. There was no showing that Dr. Groberg was available for further consultation about the standard of care or that he was even familiar with the standard of care as it existed in 1983. Subsequent affidavits indicate he was not practicing in Pocatello, Idaho in 1983.

The plaintiffs had ample time prior to trial to prepare their witness regarding the local community standard of care. The trial court allowed one limited continuance, and plaintiffs had additional opportunity during recesses to contact other doctors to qualify Dr. Tune during the course of the trial. Under these circumstances, there is no basis for a claim that the district court abused its discretion in denying the plaintiffs' motion for a continuance.

 We next consider the Gublers' argument that the combined testimony of the defendant Dr. Boe and the testimony of Dr. Tune established the local standard of care. Plaintiffs called Dr. Boe on the second day of trial and examined him extensively. Dr. Boe testified that his handling of Jake Gubler's case had not violated the local standard of care. Jake Gubler had been in and out of the clinic and the hospital since his birth with a variety of complaints. During a portion of the period of time in question, Jake was hospitalized with pneumonia. According to his testimony, Dr. Boe was not aware of any bladder infection. Dr. Boe

testified that if he had observed certain conditions he would have made a further investigation into those conditions. However, Dr. Boe testified he was unaware of any such condition at the time he provided medical care for the Gubler child.

Plaintiffs attempted to prove through Dr. Tune as an expert witness that Dr. Boe violated the standard of care because he should have been aware that the child had a palpable bladder or a urinalysis test indicating a bladder infection. Dr. Tune made a conclusion solely by reviewing the doctor and hospital records and the testimony of Dr. Boe, not from any examination that he made of Jake Gubler during the time in question in 1983. The record further reflects that Dr. Boe was not the sole physician treating the child, and during one week that the child was in the hospital he was under the care of another physician. The trial court addressed this argument, stating:

> In essence, the plaintiffs argue that Dr. Boe testified that if the child's bladder was palpable and the urinalysis indicated the existence of a bladder infection, a different course of treatment should have been followed. However, from the Court's notes from trial, it appears that there was no testimony that Dr. Boe was aware of the palpable bladder or a bladder infection. Equally significant, there was no expert testimony that it was a violation of the standard of care for Dr. Boe not to be aware of these facts under the circumstances of this case. In essence, the plaintiffs did not provide a necessary predicate to their argument.[3]

---

**3.** Dr. Boe saw the results of a urinalysis conducted while Jake was hospitalized for pneumonia. He testified that the elevated levels of protein and white blood cells were not abnormal for a child suffering acute pneumonia and that it did not necessarily indicate a kidney disorder/bladder infection.

On October 30, 1983, the day before Jake was released from the hospital, Dr. Boe, who had just resumed care of Jake, ordered a blood test (SMAC) to check for a chronic component of lung disease that would be shown in the level of serum iron. The SMAC test also provides additional information, including the liver and kidney function. The results of the SMAC test were sent by the testing lab to the hospital after

Jake's release, not to Dr. Boe's office. Approximately nine or ten days after Jake had been released from the hospital, his parents brought him back to Dr. Boe's office for further examination. When Dr. Boe did not find the SMAC test report in his office file, he telephoned the hospital records department and asked for the serum iron reading which would have advised him of the condition of Jake's chronic lung disease, the condition for which the SMAC test had been ordered. According to Dr. Boe, the hospital reported that the level of serum iron was in the medically acceptable range. Having received the information for which he had ordered the test, he testified that he did not ask for any other findings which might have been on

We find no error in the trial court's conclusion that the combined testimony of Dr. Tune and Dr. Boe did not establish that Dr. Boe had violated the standard of care set out in I.C. § 6–1012. Even combining the testimony of Dr. Tune and Dr. Boe, there was no showing by direct expert testimony that, from the information which Dr. Boe had, his treatment of Jake Gubler violated the local standard of care. Nor was there any direct expert testimony that "it was a violation of the standard of care for Dr. Boe not to be aware of these facts under the circumstances of this case," as the trial court noted. Accordingly, the trial court did not err in concluding that the plaintiffs had failed to comply with I.C. § 6–1012.

■ The plaintiff's third and fourth arguments are also without merit. Plaintiffs assert that they were denied a fair trial since Dr. Tune was not allowed to testify on fact issues relating to Jake's palpable bladder and urinalysis. However, Dr. Tune had no personal knowledge of that condition. We further agree with the district court that this evidentiary ruling had nothing to do with the determination that Dr. Tune was not qualified to testify on the issue of the standard of care. We likewise reject their fourth argument that they were denied a fair trial because they were not allowed to recall Dr. Boe to the stand. The trial court stated that the plaintiffs had already had a chance to examine Dr. Boe at length and did not reserve the right to recall him. Further, Dr. Boe had already testified that he had not violated the standard of care and the inability of Dr. Tune to testify as to the standard of care could not be remedied by the plaintiffs' recalling Dr. Boe.

The order of dismissal is affirmed. Costs to respondents. No attorney fees.

JOHNSON and McDEVITT, JJ., concur.

---

the test. The record is unclear whether he requested the hospital to forward him a copy of the SMAC test report from the lab. He testified that the first time he saw the actual written report was in preparation for trial. His testimony at trial was that, had he been aware of other findings in the test, or had he received the lab report and noticed that the creatinine and the BUN levels were elevated, he would have taken steps to find out why.

---

BISTLINE, Justice dissenting.

## PROLOGUE

It is not difficult to understand that a trial judge (in this instance, of a district court) might become short of patience with a plaintiffs' counsel who comes to trial in a medical malpractice case and has not adequately prepared his visiting expert witness to testify that he knows the prevailing standard of care in the community where the acts of alleged malpractice took place. The expert witness in this case, Dr. Tune, had been prepared to state that he did know the prevailing medical standard of care. Apparently, and unfortunately, this visiting expert had not been informed that the malpractice alleged had occurred approximately five years before he ascertained from a physician of a neighboring city forty miles north of Pocatello that the local Pocatello standard was the same as the national standard of care where the visiting doctor practiced.

Even more unfortunate than that was that neither counsel nor the visiting expert had any advance notice or knowledge that the district judge who would preside at trial would take it unto the court itself to ask Dr. Tune, testifying in 1988, if he had acquainted himself with the standard of care as it might have existed in 1983. From that point on the case of eight-year old Jake Gubler went progressively downhill, notwithstanding counsel's stalwart efforts to preserve it sufficiently to have the alleged malpractice determined by a jury which had been selected and sworn to decide the factual issues upon which the parties had been unable to agree. Based on then existing case law precedent, it should not have been difficult for plaintiffs' counsel to rehabilitate Dr. Tune, and he attempted to do so by asking for a short delay so that Dr. Tune, the Gublers' medical expert, could get in touch with Dr. Groberg of Idaho Falls. Dr. Groberg had gone through the formalities of advising

Dr. Tune as to the applicable medical practice standards of care locally. Idaho Falls is approximately a forty-minute drive from Pocatello. The population of the two cities is comparable, 46,000 inhabitants in Pocatello, and 44,000 in Idaho Falls. It was therefore not unreasonable to utilize a doctor from another town to familiarize the expert with the standard of care. The applicable statute, I.C. § 6–1012, contemplates this, especially when no other care provider is available from the same community to confer with on the standard of care.[4]

## PART I

### Denial of the Gublers' Constitutional Right to a Jury Trial

My inability to join the Court's opinion is primarily premised on a philosophical dissatisfaction with the denial of a plaintiff's right to take his or her case to a jury, often viewed as a constitutional right to which all the people of Idaho are supposedly entitled. Instead of taking that course, which was proper in light of abundant Idaho case law precedent, the district court yielded to the urging of defense counsel and entered an order, in midstream of an ongoing trial, directing a verdict in favor of the defense.[5]

4. In this instance, the defendant doctor's professional association included all the doctors in Pocatello who could state the applicable standard of care, and these doctors did not make themselves available to plaintiffs' counsel.

5. While the majority asserts that an order of dismissal was entered, no such order appears in the record. There *is* a minute entry and order which confirms the granting of defendants' motion for a directed verdict, which was granted before the close of plaintiffs' case. The Minute Entry and Order, in pertinent part, reads:

Court was reconvened ... and Dr. Bruce Tune was called, sworn and testified. Following an offer of proof by plaintiffs, outside the presence of the Jury, regarding the testimony of Dr. Tune regarding the standard of care issue and hearing oral arguments of respective counsel, the Court ruled that Dr. Tune would not be allowed to testify regarding that issue. Counsel for defendants thereafter made a Motion for Directed Verdict, counsel for plaintiffs presented oral arguments in that regard and made an offer of proof regarding

Having participated in *Stoner v. Turner*[6] as involved counsel, it has been well understood for over forty years that the policy of the Idaho Supreme Court has been, and hopefully will be, to foster the determination of legal controversies with the goal of administering justice. The plaintiff, Stoner, was granted a monetary judgment by default against the defendant on March 21, 1950, and, although it does not appear in the reported opinion, executed on his judgment which was satisfied on the sale of defendant's equipment. The district court entered an order denying a defense motion to set aside the default judgment; the motion was based on the then available grounds of mistake, inadvertence, surprise, or excusable neglect. Idaho Code § R 5–905. That order of denial was appealed. This Court in a unanimous opinion reversed and remanded with directions to set aside the default judgment, and to allow the defendant to answer. What is of significance in *Stoner* is that those five justices, Chief Justice Givens and Justices Taylor, Porter, Thomas, and Keeton, took pains to fully explain the roots of their decision:

The object of statutes and rules regulating procedure in the courts is to promote the administration of justice. Those statutes and rules which fix the

Dr. Brewer's potential testimony regarding the standard of care, the Court then ruled that Dr. Brewer would also not be allowed to testify on that issue and defense counsel renewed the Motion for Directed Verdict. Thereafter, the Court ruled from the bench:

IT IS HEREBY ORDERED that defendants' Motion for Directed Verdict be and the same is hereby GRANTED because of the plaintiffs' inability to establish a breach of the local standard of care.

The Jury was returned to the Courtroom ... and ... the Jury was discharged.

R. 82–83. The motion was broader than stated in the court's minute entry, asking "for dismissal of the case or for directed verdict or for summary judgment or whatever may be appropriate under the circumstances." Tr. Vol. II, 226. The trial came to a halt at 4 p.m. on January 19, 1989, when the court stated: "with the state of the record as it is now, I will grant the directed verdict." Tr. Vol. II, 291. The jury was brought in, roll call was taken, and the jury was discharged.

6. 73 Idaho 117, 247 P.2d 469 (1952).

time within which procedural rights are to be asserted are intended to expedite the disposition of causes to the end that justice will not be denied by inexcusable and unnecessary delay. But, except as to those which are mandatory or jurisdictional, *procedural regulations should not be so applied as to defeat their primary purpose, that is, the disposition of causes upon their substantial merits without delay or prejudice.*

*Stoner,* 73 Idaho at 121, 247 P.2d at 471 (emphasis added).

Almost twenty years later this Court was confronted with another appeal which flowed from a district court's dismissal of an appeal taken to it from a magistrate court. *Bunn v. Bunn,* 99 Idaho 710, 587 P.2d 1245 (1978). The district court's dismissal was predicated on Mrs. Bunn's motion alleging that Mr. Bunn had failed to diligently prosecute his appeal in that Mr. Bunn had not paid the court reporter the estimated fee for transcription. This Court reversed the order of dismissal, noting that:

It has long been judicial policy in Idaho that controversies be determined and disposed of each on its own particular facts and as substantial justice may require. The exercise of judicial discretion should tend to bring about a judgment on the merits. *Perry v. Perkins,* 73 Idaho 4, 245 P.2d 405 (1952); *Dellwo v. Petersen,* 34 Idaho 697, 203 P. 472 (1921). *See* 5 Am.Jur.2d *Appeal and Error § 906.* The California District Court of Appeal, Second District, in *Brown v. Guy,* 167 Cal.App.2d 211, 334 P.2d 67, 69–70 (1959), said: 'There is, of course, a strong public policy in favor of hearing appeals on their merits and of not depriving a party of his right of appeal because of technical noncompliance where he is attempting to perfect his appeal in good faith.' *Accord, Lundy v. Lakin,* 89 Cal. App.2d 849, 202 P.2d 369 (Cal.1949).

In addressing the effect of noncompliance with procedural statutes and rules, the Court in *Stoner v. Turner,* 73 Idaho 117, 121, 247 P.2d 469, 471 (1952), said:

The object of statutes and rules regulating procedure in the courts is to

promote the administration of justice. Those statutes and rules which fix the time within which procedural rights are to be asserted are intended to expedite the disposition of causes to the end that justice will not be denied by inexcusable and unnecessary delay. But, except as to those which are mandatory or jurisdictional, procedural regulations should not be so applied as to defeat their primary purpose, that is, the disposition of causes upon their substantial merits without delay or prejudice.

Such philosophy again found expression in the Idaho Rules of Civil Procedure. Rule 1, as first promulgated, stated the following, which continues in the rule as now amended:

These rules govern the procedure in the district, probate and justices' courts in the state of Idaho in all actions and proceedings of a civil nature whether cognizable as cases at law or in equity, with the exceptions stated in particular rules and in rule 81. They shall be liberally construed to secure the just, speedy and inexpensive *determination* of every action and proceeding.

Rule 1, I.R.C.P. (Emphasis added.)

A 'determination' of an action within the meaning of Rule 1 is meant to be a *determination* of the controversy on the merits-not a *termination* on a procedural technicality which serves litigants not at all. A determination entails a finding of the facts and an application of the law in order to resolve the legal rights of the litigants who hope to resolve their differences in the courts. The 'liberal construction' of the rules required by Rule 1, while it cannot alter compliance which is mandatory and jurisdictional, will ordinarily preclude dismissal of an appeal for that which is but technical noncompliance.

*Bunn,* 99 Idaho at 711–12, 587 P.2d at 1246–47 (emphasis in original). Our opinion noted as to the factual circumstances that Mrs. Bunn did not contend that she in any way had been prejudiced; that some of

Mr. Bunn's delay was attributable to an appendectomy; and that Mr. Bunn had indeed acted promptly in all but one instance. In addition, we measured the circumstances of the *Bunn* delay against the circumstances of the *Stoner* delay, and described the latter as, "a short delay thereafter on the part of the attorneys, but the total delay was not unreasonable." *Bunn*, 99 Idaho at 712, 587 P.2d at 1247. Turning again to *Bunn:*

By contrast, the district court here, in dismissing the appeal, stated only that the lapse of time, June 8 until July 29, was 'too much time,' and did not address the question of any prejudice to Mrs. Bunn occasioned by the delay. Nor does it appear that any consideration was given to the imposition of lesser sanctions, such as withholding of costs. Nor did the court express itself on the point that the very motion which led to the dismissal was the first expression of an insistence that the appeal be moved along.

The statement of the court that June 8, 1977, was a *deadline* for payment of the estimated fee is indicative that the court felt that anything less than strict compliance with the 5–day rule necessitated a dismissal. At oral argument, counsel representing Mrs. Bunn stated that her position would be the same had the delay been one of only 15 days, as against 49. We do not see the rule as being that demanding. Rather, repeating what the Court said in *Stoner, supra,* we continue to believe that rules which regulate procedure in the courts, other than those which are mandatory and jurisdictional, 'should not be so applied as to defeat their primary purpose....' *Id.* Just recently this Court, acting upon the work product and recommendation of a committee of members of the Idaho Bar, adopted and promulgated a complete new set of appellate rules governing appeals to this Court from district courts. The previous rules and statutes which had long served vexatious to the bar were narrowed to but one jurisdictional rule, the timely filing of the notice, thus continuing the earlier philosophy of Idaho jurisprudence which recognizes *that*

*rules of procedure are designed to promote the disposition of causes upon their substantial merits.*

*Bunn*, .99 Idaho at 712–13, 587 P.2d at 2147–48 (emphasis in original and added). For similar holdings, *see Miller v. Miller,* 96 Idaho 10, 523 P.2d 827 (1974), and *McNett v. McNett,* 95 Idaho 59, 501 P.2d 1059 (1973).

With knowledge of Idaho's jurisprudence being so thoroughly steeped in the belief that courts sit to do justice and that litigants are not to be ousted from their day in court on the basis of technical defects in procedure or technical procedural violations, and that civil actions seeking redress or remuneration are to be resolved by a *determination* on their merits rather than a *termination* on procedural technicality, one can only wonder that of five justices, why four are willing to put out of mind the illustrious opinions issued by earlier equally illustrious courts which have preceded us, and to ignore the main precept of this very Court's Rule 1(a): "These rules *shall* be liberally construed to secure the just, speedy and inexpensive determination of every action and proceeding." I.R.C.P. 1(a) (emphasis added).

It cannot be seriously asserted by anyone that the Gublers' civil action has been determined on its merits. The opinion for the Court does not contend that it has been so decided. Rather, the Court's opinion recognizes it has not been decided on the merits. The jury which had been selected was not allowed to decide (1) whether the defendant doctor was causally negligent, and (2) whether the applicable standard of medical practice was established to take that issue to the jury. The district court in its written memorandum decision and order which denied the Gublers' motion for a new trial commented on many aspects of the trial, none of which included why the plaintiffs' action could not have been terminated "without prejudice." The district court did in that aforementioned decision and order seek to temper the harshness of its ruling by stating that "plaintiffs' counsel was provided with a limited period of time to provide Dr. Tune with an opportunity to con-

tact Dr. Groberg. These efforts were unsuccessful." That is true. Equally true, as the record reflects, the allotted time was only fifteen minutes, and that was begrudgingly given. The court went on to suggest that ten minutes would be preferred.

## PART II

### Facts Undisclosed by the Majority Opinion

A very large concern with the Court's opinion is that it withholds from the reader, perhaps by oversight, matters of fact which are readily available in the appeal record. Or, if the fact is there, it is obscured. In addition, there is at least one affirmative misstatement of the record.[7]

Called as a witness by the plaintiffs, the defendant identified himself as Dr. Roger W. Boe, a pediatrician at the Pocatello Children's and Adolescent Clinic. R., Vol. I, p. 2. He identified by name the other four doctors who were his partners on the day of his testimony, and that the partnership when formed was comprised of the named doctors, including himself, and a Dr. Boydon who was no longer a partner. The majority opinion seemingly concedes that Dr. Boe was the child's treating physician, but apparently sees it of some moment that during one week of the child's hospitalization "he was under the care of another physician." Apparently the insertion of that assertion into the opinion is a gratuity which is intended to bolster the preceding statement to the effect that Dr. Tune

reached a medical conclusion *"solely* by reviewing the doctor and hospital records and the testimony of Dr. Boe, not from any examination he made of Jake Gubler during the time in question in 1983." 120 Idaho at 302, 815 P.2d at 1037 (emphasis added). It would be surprising if the entire trial bar will not be astounded at that remarkable sentence, especially wherein it states that Dr. Tune's conclusion was not based on an examination of Jake Gubler in 1983. In all of the clerk's record and the reporter's transcripts on appeal, and in all of the briefing we have before us, there is not a scintilla of a suggestion that Dr. Tune had even been in Idaho in 1983, or had any contact with the Gubler family. Of course Dr. Tune did not examine the child in 1983. Of course the doctor, in reaching his medical conclusion, had to acquaint himself with the medical records of the examination and treatment records which Dr. Boe was obliged to furnish. Of course Dr. Tune reviewed those records. Likewise, Dr. Boe reviewed the records of Dr. Yost who for a few days took over for Dr. Boe.

This Court has had before it previous appeals in medical malpractice cases, many of them, in fact. In a different context, that of personal injury actions, we have had the same situation before us, with plaintiffs alleging in their complaints serious and disabling injuries, and defendants thoroughly examining all available records, which in turn are examined by defendants' experts who in turn will draw their own

---

7. As referred to before, no order of dismissal was entered—this litigation ended on a directed verdict. This Court's opinion strangely treats the termination of the case as a dismissal with prejudice under I.R.C.P. 41(b). Counsel for plaintiffs may well wonder what transpires within these marble walls when opinions address the propriety of such a dismissal, which such it was not. The error on the part of the majority is significant. Entirely disregarded by the justices comprising the majority is that by moving for a directed verdict,

the defendants necessarily admitted the truth of all of the plaintiffs' evidence and every legitimate inference that could be drawn therefrom in the light most favorable to the plaintiff.... Hence, the trial judge is not free to weight the evidence or pass on the credibility of witnesses and make his own separate

findings of fact and compare them to the jury's findings as he would in deciding on a motion for a new trial.
....
Whether a verdict should be directed, as noted above, is purely a question of law and on those questions, the parties are entitled to full review by the appellate court without special deference to the views of the trial court.

*Quick v. Crane,* 111 Idaho 759, 763–64, 727 P.2d 1187, 1191–92 (1986) (footnote and citations omitted). Unlike the consideration of a new trial motion, in which our appellate review seeks to ascertain whether the trial court's ruling was or was not an abuse of discretion, *Dinneen v. Finch,* 100 Idaho 620, 603 P.2d 575 (1979), the grant or denial of a directed verdict is reviewed *de novo* by the appellate court in accord with the case law precedent.

conclusions as to the severity of the injuries, and the duration of anticipated pain and suffering. The Chief Justice knows, as do all of us, that it cannot truthfully be said that Dr. Tune's conclusion was based *solely* on his review of the defendant's records. That is, however, the thought advanced, notwithstanding that Dr. Tune has specialized in the same field of medicine as Dr. Boe, is an expert, and both of the doctors are board-certified in the same specialty, all of which we regularly see in these cases as well as in damage actions based on personal injury claims.

As to some other doctor filling in for Dr. Boe, that is equally commonplace. The majority opinion would be better had that not been advanced, because it is something in the nature of a phantom vehicle which caused an accident and was never seen again, or the phantom black horse which suddenly appeared on the roadway, causing the driver to swerve into the path of another vehicle. None of the foregoing amounted to a predicate for the statement which followed, *i.e.:* "The trial court addressed this argument...." 120 Idaho at 302, 815 P.2d at 1037. The trial court did address the issue of liability, but his remarks as quoted by the Chief Justice did not even mention Dr. Tune and his expert opinion. It is true that the district court did rule Dr. Tune ineligible to testify as to whether Dr. Boe's treatment of Jake Gubler was in accordance with the local standard of care, as knowledge of the local standard of care is a prerequisite to testifying on that issue. That is what this appeal is all about. Some of us on the Court have had adequate schooling in that regard by reason of previous similar cases.

### PART III

#### What the Appellants Assert as Error Has Not Been Confronted

Just as Drs. Boe and Tune are experts in their field, there are also legal experts, persons of considerable experience, learned in the law, and good writers. The appellants have furnished this Court with a helpful brief, both as to composition and content. As will appear *infra,* in regard to

Dr. Boe's testimony relative to the local community standard of care, counsel's brief referred to volume, page, and line of the transcript. The transcription of those thirteen references was personally checked and found to be accurate. There can be no doubting the verity of plaintiffs' counsel. After providing the content of the involved statutory requirements, the brief brings our attention back to the following excerpt from *Buck v. St. Clair,* 108 Idaho 743, 746–47, 702 P.2d 781, 784–85 (1985):

I.C. § 6–1013 also provides that a competent expert witness who resides elsewhere can testify if he has adequately familiarized himself with the local standard of care. The trial court ruled that Dr. Broms had not adequately familiarized himself with the local standard of care for Boise. We believe this was incorrect. By virtue of their training, board-certified specialists are familiar with the local standard of care which is equivalent to the national standard of care. In order to meet the requirement of I.C. § 6–1013(c) showing adequate familiarization a specialist must demonstrate two elements: first, that he is board-certified in the same specialty as that of the defendant-physician; this demonstrates knowledge of the appropriate standard of care of board-certified physicians practicing in the specialty in question. Second, an out-of-the-area doctor must inquire of the local standard in order to insure there are no local deviations from the national standard under which the defendant-physician and witness-physician were trained. In the instant case, Dr. Broms testified that he was a board-certified obstetrician-gynecologist, that he was familiar with the standard of care through regular reading of regional and national medical journals, and that he was familiar with the local standard of care. Dr. Broms obtained his familiarity with the local standard through his specialty training combined with his questioning of Dr. Roberge, a Caldwell board-certified obstetrician-gynecologist who told Dr. Broms that the local standard of care was equivalent to the national standard of care. At that

point Dr. Broms possessed actual knowledge of the applicable said community standard as required by I.C. § 6–1013(c). Furthermore, we believe this degree of inquiry was adequate. Had Dr. Broms been told there was not a uniform standard, then further investigation would have been merited. However, Dr. Broms had every reason to believe the statement of a Caldwell obstetrician-gynecologist that there was a national standard of care for physicians practicing in this specialty. Upon learning this, further inquiry was not warranted.

Subsection (c) of I.C. § 6–1013 specifically provides that this section shall not be used to prohibit or preclude a competent witness from adequately familiarizing himself with the standards and practices of an area. Dr. Broms testified he was a board-certified obstetrician-gynecologist who had inquired of a local board-certified obstetrician-gynecologist who told him the local standard was the same as the national standard. Hence, his testimony should not have been precluded. Dr. Broms demonstrated his familiarity with the specialty and with the local standard of care which does not deviate from the national standard of care for this specialized area of practice. Nothing more needed to be done to qualify Dr. Broms' testimony.

*Buck's* holding has *not* been overruled by subsequent decisions. For instance, in *Grimes v. Green*, 113 Idaho 519, 746 P.2d 978 (1987), the holding quoted above is quoted by this Court as being the core holding of *Buck*, but the *Grimes* opinion also indicated that the balance of *Buck* was dicta. Likewise, in *Frank v. East Shoshone Hosp.*, 114 Idaho 480, 482, 757 P.2d 1199, 1201 (1988), this Court cited *Buck* as follows: "In *Buck v. St. Clair* the expert became familiar with the local standard of care by simply questioning a local doctor." And this Court referred to that as verifying that there is not an onerous burden upon plaintiffs to familiarize their experts with local standards. Also, in footnote 3 of *Frank* this Court stated that "[a]lthough the *Buck* decision was subsequently limited

and clarified in *Grimes v. Green* the above-noted point of law was not." *Id.*

In the case at bar, plaintiffs' expert, Dr. Tune, was board-certified in the same specialty as defendant physician, Dr. Boe. Dr. Tune then inquired of an Idaho Falls board-certified physician, Dr. Groberg, as to whether there existed any deviations in Idaho from the national standard. Dr. Groberg stated to Dr. Tune that the standard of care and practice in Idaho was the same as elsewhere. The trial court disqualified Dr. Tune as an expert witness since Dr. Tune did not specify the years of 1983–84 in his inquiries to Dr. Groberg. However, first, Dr. Tune testified that the standard of care had not changed for the last twenty (20) years, and that the diagnosis of urinary tract infection and obstruction was classic text book material learned in medical school. When asked specifically whether the standard had changed within the last seven (7) years, Dr. Tune replied in the negative. Secondly, Dr. Boe himself testified that diagnosis of urinary tract infection and obstruction was learned during his pediatric residency. Thirdly, Defendant Dr. Boe had already testified to the following as the standard of care in Pocatello in 1983–84:

1. The standard required further investigation if a urinary tract infection was suspected; (Tr. Vol. I, p. 6, Ll. 16–25, and p. 7, Ll. 1–5.)

Q. Let me ask it this way: If you have a little boy with a urinary tract infection, does that create more concern in your mind as a pediatrician than if you have a little girl with a urinary tract infection?

A. It would indicate a need for further investigation.

Q. Is it fair to say that pediatricians generally, if they're dealing with a little boy who has a urinary tract infection, that they want to investigate that little boy's urinary tract?

A. Yes.

Q. And by "investigate," I mean make sure it's a normal urinary tract, normal drainage system. Is that how you understood the question?

A. Yes.

2. The standard required a review of a newborn's delivery record; (Tr. Vol. I, p. 13, Ll. 8–14.)

Q. When you go in to see a newborn baby as a pediatrician, do you ordinarily review the delivery record?

A. Yes.

Q. That's part of your usual custom and practice?

A. Yes.

3. The standard required further study and tests if a urinary tract obstruction was suspected; (Tr. Vol. I, p. 16, Ll. 12–25, and p. 17, Ll. 1–11.)

Q. Now, if you had, as a pediatrician, if in your mind you had suspected a urinary tract obstruction in Jake in those first days of life, as a pediatrician, what would the standard of care have required of you in Pocatello?

A. If I had suspected it, I would not have thought of standard of care. I would have felt that I wish to get a, a further study on it to find out what was—if there was any abnormality there.

Q. Okay. I don't mean to imply that, if you thought of it, you would have said 'What was the standard of care?' And that was—so I'll have to ask you that question someday in a courtroom.

What I mean is: Assuming you were complying with the standard of care in the community of Pocatello, and, in the first three days of life, you did in fact suspect a blockage of the urinary tract—what would you have done?

A. I would have ordered further tests.

Q. Why?

A. I would have ordered a—

Q. Before you tell me which test, why would you have done that?

A. To find out if there was a urinary tract abnormality.

4. The standard required a renal ultrasound, a voiding cystourethrogram, and x-rays if a urinary tract infection was suspected; (Tr. Vol. I, p. 18, Ll. 18–25, and p. 19, Ll. 1–10.)

Q. By Mr. Kussman: I interrupted you earlier. Let me get back to that for a second.

When you started to tell me which or what tests you would have done if you suspected an obstruction, what tests would you have done?

A. I would have done a renal ultrasound or a—and a voiding cystourethrogram.

Q. A voiding cystourethrogram, is that a test where they put a tube and inject some dye into the bladder—put a tube into the bladder and inject some dye?

A. You've answered it.

Q. Is that right?

A. Yes.

Q. Okay. And then take x-rays?

A. Yes.

Q. And then you can see the outline of the bladder and the collecting system?

A. Yes.

5. The standard required a review of the nurses' notes about a patient; (Tr. Vol. I, p. 23, Ll. 2–19.)

Now, as an attending physician for children in the hospital, was it your custom and practice to read the nurses' notes about your patient?

A. During the time I was taking care of the baby, yes.

Q. Okay. I take it, from your answer the, you mean that if you had a baby or child in the hospital, that your custom and practice would be to read the nurses' notes about that child while you were taking care of that child?

A. Yes.

Q. All right. And why did you do that?

A. Just because I, I felt—I feel that all information is valid and appropriate and of importance to look at.

Q. You felt that assisted you in getting a full picture of the patient's condition?

A. Yes.

6. The standard required follow-up examination if an LPN noted a swollen bladder; (Tr. Vol. I, p. 28, Ll. 10–13.)

Q. But if an LPN told you that she thought that your patient had a hard mass or a swollen bladder, you would have gone in and checked yourself, right?

A. I would have examined the baby, yes.

7. The standard required concern for and a suspicion of urinary tract obstruction if an enlarged bladder was present; (Tr. Vol. I, p. 29, Ll. 6–18)

Q. If, in your mind, you felt that the baby did have an enlarged bladder, that would have suggested to you that perhaps the baby had a urinary tract obstruction, correct?

A. If I had felt such, I would have been—there are many things that can cause abnormal masses, and I would have had that as something to consider along with many other things.

Q. If you were concerned, in your mind, that you had a little baby who had an enlarged bladder, one of the things you'd have been concerned about was that he had an obstruction causing the bladder to enlarge, right?

A. That would be possible.

8. The standard required further investigation and tests if an enlarged bladder was suspected; (Tr. Vol. I, p. 29, Ll. 19–25, and p. 30, Ll. 1–10.)

Q. And if, in your opinion, the baby did have an enlarged bladder, you would have taken steps to determine why, correct?

A. If I had determined that it was in fact an enlarged bladder, yes.

Q. And you wouldn't, you wouldn't have a baby in whom you thought the bladder was enlarged and just sent him home, would you?

A. No.

Q. And one of the things you would have done was to investigate that baby's urinary tract to see if it was obstructed, true?

A. Yes.

Q. And one of the things you would have ordered, under those circumstances, would be one of these voiding cystoureterograms, correct?

A. Yes.

9. The standard required a review of an entire SMAC test ordered for a patient; (Tr. Vol. I, p. 55, Ll. 5–25, and p. 56, Ll. 1–8.)

Q. Now, when you ordered the SMAC test on Jake on the 30th, it was your intent to see the results shortly thereafter.

A. Yes.

Q. Did you?

A. No.

Q. In your custom and practice, in ordering SMAC tests, you usually look at all the results on the SMAC test regardless of whether you order it for one particular result, true?

A. Yes.

Q. So let's say you, hypothetically, ordered a SMAC test to check someone's serum iron. When that SMAC test came back to your hands, your custom and practice would be to review all the results, not just the serum iron; am I right?

A. Oh, yes.

Q. Why is that?

A. Just because I want to know all the results that are available on this, and I usually look at all the tests.

Q. So let's say, hypothetically, you ordered this SMAC test on Jake on October 30th. If you did get the results back, you would have looked at the iron for one thing, right?

A. Yes.

Q. And you would have looked at the other results, including the BUN and creatinine?

A. Yes.

10. The standard required a doctor to be responsible for all the lab work ordered for a patient; (Tr. Vol. I, p. 56, Ll. 13–16.)

Q. In your practice, it's your feeling that you're responsible for all the lab work that you order, correct?

A. Yes.

11. The standard required further investigation and tests if elevated SMAC test results were discovered; (Tr. Vol. I, p. 56, L1. 20–25, and p. 57, L1. 1–25, and p. 58, L1. 1–8.)

Q. Now, if you had seen, hypothetically, this result on Jake, say, in November of 1983, what, if anything, would you have done?

A. I would have immediately followed through, repeated the test, and taken steps to find out why, why the BUN and creatinine were elevated.

Q. When you say 'immediately,' can you give me a time frame?

A. Right away.

Q. Why would you do that?

A. Because I would want to find out the cause of an elevation like that.

Q. You wouldn't have looked at it, seen a creatinine of 1.6—let me back up a little bit.

The creatinine is 1.6 on that result, correct?

A. Yes.

Q. And the normal for a child would be what, about?

A. Lower than 1.0.

Q. All right. And the BUN is 66, which is also elevated?

A. Yes.

Q. You wouldn't have looked at those in November of 1983 and said, well, they're elevated, but no big deal, would you?

A. I don't think you could have quoted me on that, no. No.

Q. In fact, if a physician in this community saw that lab result on a three-and-a-half-month-old baby, the standard of care would have required that he investigate the cause of that, correct?

A. Yes.

Q. If you had investigated the cause of Jake's elevated BUN and creatinine in November and found that it was due to posterior urethral valves, what would you have done?

A. I would have sent the baby to Salt Lake City for further evaluation and treatment.

12. The standard required lab test results to be sent to the clinic to be placed in the patient's chart. (Tr. Vol. I, p. 60, L1. 17–20.)

Q. In the usual course of events, when a patient is discharged from the hospital, is the SMAC test sent to the patient's chart in the clinic?

A. It usually is.

13. The standard required further investigation if posterior urethral valves was suspected. (Tr. Vol. I, p. 93, L1. 9–13.)

Q. Would you agree, though, that the standard of care requires that if a doctor suspects posterior urethral valves, that he go ahead and further evaluate the patient?

A. Yes, I do.

Based on the foregoing testimony of Dr. Boe, counsel's brief urges that Dr. Tune's knowledge of the applicable standard of care as to site and time was established:

The above-noted testimony of Defendant Dr. Boe shows that the standard in Pocatello in 1983–84 was the same as the national standard, a standard which had not changed since before 1983 as Dr. Tune had testified. The trial court ignored Dr. Tune's testimony about the standard not changing, since this referred only to the national standard and didn't say anything about whether the local standard was the same in 1983. (Tr. Vol. II, p. 277, L1. 19–25.) However, as Dr. Boe's above cited testimony shows, the standard in Pocatello in 1983 was the same as the national standard. If Plaintiffs' expert Dr. Tune had testified that Defendant should have performed a renal biopsy or a ureterostomy or a magnetic resonance, none of which could have been done in Pocatello, that would have been inappropriate. The statutes are designed to prevent this. The statutes are designed to prevent an out-of-state expert from holding a local doctor to a higher standard of care. However, Dr. Tune stated that the diagnosis for urinary tract infection or obstruction is basic medical school learning.

Dr. Boe even testified that he had diagnosed this condition before seeing Plaintiff. Dr. Boe had seen a patient with this same disorder and had also ordered a voiding cystourethrogram on another patient in Pocatello with the same condition. This isn't a sophisticated test.

Thus, given the testimony of the two doctors, Dr. Boe and Dr. Tune, it is apparent that the standard for diagnosing this condition was the same in Pocatello in 1983–84 as it was nationally and that Defendants had the resources available to them in Pocatello during this time to make such diagnosis.

Additionally, the mere fact that Dr. Tune and Dr. Groberg did not specify the time period to 1983–84 does not mean that they didn't familiarize themselves with the standard of care for that time.

Counsel for plaintiffs also brings to our attention an exceptionally persuasive opinion from an enlightened unanimous California Supreme Court, authored by Justice Mosk, *Brown v. Colm*, 11 Cal.3d 639, 114 Cal.Rptr. 128, 522 P.2d 688 (Cal.1974). In style and content it is written much the same as the late Justice Shepard wrote one of his last opinions for this Court, *Clarke v. Prenger*, 114 Idaho 766, 760 P.2d 1182 (1988). That plaintiff, Vicki Clarke, had the same experience as plaintiff Laura Brown in pursuing a claim of medical malpractice. Each was ousted summarily by the trial court on motion of the defense, Vicki Clarke not even getting to trial, and Laura Brown on a ruling that she had not been able to prove the applicable standard of care:

> In the present case, Dr. Blodgett examined all the available literature on the matter at issue and his opinion was based not only upon this material but also upon his personal training and experience acquired in the decade after 1959 in the use of suture materials. He was offering his opinion only as to whether the practice was the same ten years previously. Defendant's insistence that Dr. Blodgett was not qualified to testify as to the 1949 standard tends to equate his qualifications with those of a layman in related knowledge of medical practice in 1949, and disregards entirely the extent to which his training and experience contribute to his expert evaluation of the prior standard of care.
>
> . . . .
>
> The unmistakable general trend in recent years has been toward liberalizing the rules relating to the testimonial qualifications of medical experts.
>
> . . . .
>
> There are sound and persuasive reasons supporting this trend toward permitting admissibility more readily, rather than rigidly compelling rejection of expert testimony. It is obvious that an overly strict standard of qualification would make it difficult and in some instances virtually impossible to secure a qualified expert witness. In the present case, for example, it is doubtful that plaintiff could produce a medical doctor who was qualified to testify as to the standard of care in view of the rarity of the operation and the fact that the surgery had occurred in a comparatively small and isolated community 23 years prior to trial.
>
> On the other hand, if the threshold test of general testimonial qualification is found to be met and the witness is permitted to testify on direct examination, he is subject to as penetrating a cross-examination as the ingenuity and intellect of opposing counsel can devise. This inquiry may challenge not only the knowledge of the witness on the specific subject at issue, but also the reasons for his opinion and his evaluation of any written material upon which he relied in preparation for his testimony. (Evid. Code, § 721.) Further, a defendant is free to argue that the witness' testimony is not entitled to acceptance of credibility because he lacks personal acquaintance with the subject at the time the alleged negligent act occurred, and defendant may produce his own witnesses in rebuttal. These measures are more than adequate to protect a defendant's interests.
>
> It is true, as defendant contends, that the questions whether a witness qualifies as an expert is a matter addressed in the

first instance to the sound discretion of the trial court. (*Sinz v. Ownes, supra,* 33 Cal.2d 749, 755, 205 P.2d 3) It is also elementary, however, that the court will be deemed to have abused its discretion if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go before the jury. (*Seneris v. Haas, supra,* 45 Cal.2d 811, 833, 291 P.2d 915) Indeed, the exclusion of the sole expert relied upon by a party because of an erroneous view of his qualifications is, in a case where expert testimony is essential, an abuse of discretion as a matter of law requiring reversal. (*Moore v. Belt, supra,* 34 Cal.2d [525] at p. 552, 212 P.2d 509) Since the trial court's exclusion of Dr. Blodgett's testimony was based entirely upon his lack of personal experience with the standard of care prevailing in 1949, we believe for the reasons stated above that the order was erroneous. Clearly, the error was prejudicial, as the primary basis for granting the nonsuit was the lack of evidence in the record as to the 1949 standard of care.

*Brown v. Colm,* 114 Cal.Rptr. at 130–32, 522 P.2d at 691–93 (*en banc* 1974).

In the case at bar, the mere fact that Dr. Tune and Dr. Groberg did not specifically address the 1983–84 standard of care does not mean they could not have readily done so. Dr. Groberg would have simply referred Dr. Tune to his partner, Dr. Davis. Dr. Groberg likewise inquired of Dr. Davis of the standard of care in 1983–84. Dr. Tune could not familiarize himself with the applicable standard of care with a Pocatello doctor since all of the pediatricians in Pocatello were associated with defendant clinic. In fact, and emphasizing that problem, the State of Idaho used an Idaho Falls doctor in the prelitigation screening panel. Dr. Tune tried unsuccessfully to inquire of other doctors.

As to sufficient proof of the local standard of care, it is submitted that not one of those comprising the Court's majority can proffer any refutation of my assertion based on a painstaking review of the record that a reasonable jury would have concluded that the following facts were sufficiently shown:

1. Dr. Groberg told Dr. Tune that the standard was the same as the national standard.

2. Dr. Tune testified that the standard hadn't changed since before 1983.

3. Dr. Boe testified that he learned about urinary tract problems in residency.

4. Dr. Boe testified as to what that standard was in Pocatello in 1983–84, which verifies that the standard Pocatello in 1983–84 was the same as the national standard.

5. Dr. Groberg and Dr. Davis were familiar with the standard of care in Pocatello in 1983–84 as well, as stated in their affidavits.

Clearly, the trial court erred in disqualifying Dr. Tune and granting a directed verdict in favor of defendants, doing so before plaintiffs had rested their case in chief.

In *Clarke v. Prenger,* 114 Idaho 766, 768, 760 P.2d 1182, 1184 (1988), this Court, per Justice Shepard, stated:

We take this occasion to express our disapproval of what appears to be a growing practice among the trial courts of this state dismissing medical malpractice cases at the summary judgment point on the basis that plaintiff's expert witnesses are not sufficiently familiar with the standard of care to be expected from defendant-physicians. Our rules and our decisional law, *Worthen v. State,* 96 Idaho 175, 525 P.2d 957 (1974); *Tri-State Nat. Bank v. Western Gateway Storage Co.,* 92 Idaho 543, 447 P.2d 409 (1968); I.R.C.P. 56(e), demonstrate that when faced with a motion for summary judgment the party against whom it is sought may not merely rest on allegations contained in his pleadings. Rather, he must come forward and produce evidence by way of deposition or affidavit to contradict the assertions of the moving party and establish a genuine issue of material fact. We do not view such burden as being onerous on plaintiffs *in medical malpractice cases* since ordinarily *it only requires a positive indica-*

*tion that plaintiffs' expert witnesses possess the requisite knowledge of the local standard of care which has been allegedly violated.* Unfortunately, plaintiffs' counsel too often are either unaware of the requirements of the summary judgment process, or fail to take their responsibilities seriously. On the other hand, it appears that some of our trial judges fail to recognize *their obligation to construe not only the evidence before the court, but all reasonable inferences that flow therefrom, most favorably to the nonmoving party.* In our view the instant case provides an example of the lack of specific detail by plaintiff's counsel, and the error of the trial court in failing to view the evidence and the inferences flowing therefrom, most favorably toward the nonmoving party.

It would serve no purpose to set forth the affidavits of Dr. Rattray and the correspondence attached thereto at length. It is sufficient to say they may be viewed as deficient in that they fail to delineate the process by which the witness obtained his alleged knowledge of the local standard of care then prevailing in Shoshone County. However, if such were a material deficiency, and if indeed no process had been engaged in to determine such standard, the deficiencies could have been established by taking the deposition of the witness.

Nevertheless, the affidavits *establish by conclusory statements that the witness possessed knowledge of the applicable local standard of care incumbent* upon each defendant in their board-certified specialties. Hence, we hold that the statements contained in the affidavits, *together with all the legitimate inferences flowing therefrom*, were sufficient to establish the existence of a genuine issue of material fact which precluded the issuance of a summary judgment, i.e., did Rattray possess the requisite knowledge of the required standard of care.

*Clarke*, 114 Idaho at 768, 760 P.2d at 1184 (emphasis added). The opinion was joined by Justices Bistline, Huntley, and Johnson.[8]

## PART IV

### Evidence Sufficient for Presentation of the Case to a Jury was Established

The evidence in the case at bar establishes that Dr. Tune possessed the requisite knowledge of the applicable local standard of care in 1983–84. The real problem with the district court's termination of the case, however, is by what right did the court deprive the jury of its function of deciding whether the plaintiffs had satisfactorily established that Dr. Tune, plaintiffs' expert witness, was acquainted with the local standard of medical care? That is a primary issue. Likewise, a major issue is the court's directing a verdict for the defendants.

In a case recently before the Court, *Clements Farms, Inc. v. Ben Fish & Son*, 120 Idaho 185, 814 P.2d 917 (1991), the main issue involved a disclaimer and the requirement that to be effective a disclaimer must be conspicuous. The Uniform

---

8. Justice Bakes dissented, asserting that Dr. Rattray, plaintiff's expert witness, "failed to demonstrate that he has the qualifications necessary to testify as an expert in this case. An adequate foundation was not laid by the mere inclusion of his conclusory statement, *e.g.,* 'I am generally familiar with the standards of medical care....'" He noted the similarity of that case to *Pearson v. Parsons*, 114 Idaho 334, 757 P.2d 197 (1988), decided two months earlier in June of 1988, making reference thereto of his an "in-depth discussion of the applicable law."

Justice Johnson authored the Court's opinion in *Pearson v. Parsons*, and joining his opinion were Chief Justice Shepard, and Justices Bistline and Huntley. Interestingly, Justice Bakes concurred in the result only, using the occasion to assert that the affidavit of Dr. Weeks was deficient. Justice Johnson, and the three members of the Court joining his opinion, were of the view that "the affidavit of Dr. Weeks was sufficient to raise a genuine issue of material fact and to defeat the motion for summary judgment." *Pearson*, 114 Idaho at 338, 757 P.2d at 200. In reality, it is readily seen that the opinion written by Justice Bakes in *Clarke v. Prenger* was a strong dissent, and today he will be seen as bringing down this Court's previous holdings in the medical malpractice field which allowed a medical malpractice plaintiff to put his case before a jury, including *Clarke v. Prenger*.

Commercial Code provides that the single issue, i.e., "whether a term or clause is 'conspicuous' or not is *for decision by the court.*" U.C.C. 28–1–201(10) (emphasis added). There is no such provision, or anything bearing a resemblance to the statute involved, in this case.

Idaho Code § 6–1012 states:

In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care, ... such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by preponderance of all competent evidence, that such defendant then and there failed to meet the applicable standard of health care practice of the community in which care allegedly was or should have been provided ...

Idaho Code § 6–1013 adds to I.C. § 6–1012 that the applicable standard of practice must be established by the plaintiff in the form of one or more knowledgeable, competent expert witnesses, and lays down, as one of the various prerequisites to the admission (foundation) that, as pertinent to this discussion, "that such expert witness possesses professional knowledge and expertise *coupled with actual knowledge of the applicable standard* to which his or her expert testimony is addressed...." The foregoing should make it abundantly clear, in comparing the U.C.C. statutory provision in the *Clements* case with the instant *Gubler* case, that the statute in no way makes a district court the ultimate decision maker as to whether the plaintiff prevails or fails. If the plaintiff makes a *prima facie* case that the plaintiff's expert has become knowledgeable as to the local applicable standard of care the plaintiff is entitled to have the case laid before the jury which has been assembled, selected, and sworn to perform its function of decision making. At stake in the *Gubler* case is the constitutional right of jury trial. That right of plaintiffs was confiscated and the jury function usurped when the court ruled on his own thought that, "on a foundational matter, its somewhat like a court trial ..." Tr. Vol. II, p. 209, L1. 24–25.

Those remarks were made immediately after hearing Mr. Powers, of counsel for the defense, relative to plaintiffs having Dr. Tune on the stand and under discussion were Dr. Tune's qualifications as an expert witness about to testify as an expert in plaintiffs' behalf as to the alleged negligence of Dr. Boe in regard to treating Jake Gubler. As is readily apparent to the reader, the defense was challenging Dr. Tune's qualifications for presenting such testimony.

On reflection, it is better to set out the entire paragraph in which those remarks were made, so as to obtain the full flavor of the court's stance:

THE COURT: Thank you. Gentlemen, at the risk of somewhat prolonging this, it appeared to me from closing argument that I need to ask the witness about three questions just to clarify what I *think* has already been testified to. I would never do this, of course, in the presence of the jury, but I think on a foundational matter it's somewhat like a court trial and I am going to exercise my prerogative and discretion to do so.

R. 209–10 (emphasis added). At this juncture, so as to better understand how this flew out of hand, it is imperative to keep in mind that Mr. Hall had just prior thereto concluded his cross examination of Dr. Tune and had *not* asked any question of Dr. Tune which was relative to the *time* element of I.C. § 6–1012 and I.C. § 6–1013. Moreover, Mr. Hall's co-counsel had not presented any argument to the court which suggested or even intimated that a flaw, if not a fatality in plaintiffs' ability to go forward was found in the fact that Dr. Groberg's enlightenment of Dr. Tune as to the applicable standard of medical practice did not specifically include a span of time three or four years earlier than the date of their conversation.

It is to be kept in mind that the jury would decide two issues: (1) were the defendants' actions or inactions negligent, resulting in injury to Jake Gubler, and (2) was that conduct below the applicable standard of care of which they found sufficient proof from the testimony, meaning any tes-

312

timony from any of the parties involved or from the witnesses of any such parties. Had the case gone to the jury, in that manner the jury would have resolved the ultimate issue. However, suddenly that opportunity became precluded when the court intervened to ask a question which was not within its prerogative to ask, especially when counsel had not seen fit to do so:

EXAMINATION BY THE COURT:

Q. Doctor, would you describe for me precisely what you learned from Dr. Groberg about the deviation from the standard of care in Pocatello, Idaho, and the national standard of care applicable to board certified pediatricians in the recognition, diagnosis, and treatment of urinary tract infections or obstructions?

A. I spoke to Dr. Groberg about the standard of pediatric care in Idaho regarding the diagnosis and management and further possible work-up of children with urinary tract infections and/or obstruction of the urinary tract, specifically whether a different standard might be applied in Idaho compared to elsewhere in the country.

Q. And what was his response?

A. Absolutely not, that he had practiced medicine in four states, and the standard was the same throughout.

Q. Was specific reference made to Pocatello, Idaho?

A. Not to the city.

Q. Did he indicate that there was no deviation anywhere in Idaho as compared to the national standard?

A. He indicated no deviation anywhere in Idaho. I said in Idaho, and he said absolutely not.

Q. Was reference made to a time from such as 1983 or 1984 as to whether the standard deviated during that time frame?

A. I do not recall a discussion of time.

Q. When did this conversation take place?

A. I'll have to look at my notes. July 20, 1988.

R. 210-11. An inference is readily drawn that *all counsel* involved, there being more than one at the defendants' table and at the plaintiffs' table, had been of the same view as the doctors, *i.e.*, that four or five years had no visible effect upon the local applicable standard of care, which is not difficult to expect. The district judge, however, without testifying to his own medical background and expertise, unfortunately and improperly, entered into the trial arena. There may be some Idaho case law precedent for such a judicial intervention, but I am unaware of it.

In the cases of *Frank v. East Shoshone Hosp.*, 114 Idaho 480, 757 P.2d 1199 (1988), and *Dekker v. Magic Valley Reg. Med. Ctr.*, 115 Idaho 332, 766 P.2d 1213 (1988), this Court held that the expert affidavits in question did not satisfy the foundational requirements of I.C. § 6–1012 and § 6–1013. However, those two cases can be distinguished in that the affidavits in question made absolutely no reference to any knowledge of the applicable standard of care. The expert doctors had not made any attempt to inquire as to the applicable standard.

In *Frank* this Court stated:

Idaho Code § 6–1013(c) states that in any medical malpractice case, plaintiff must establish that such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable said community standard to which his or her expert testimony is addressed. The deposition testimony of plaintiffs' expert, Dr. Blaisdell, however, fails to establish that Dr. Blaisdell was familiar with the local standard of care at the East Shoshone Hospital.

The record in *Frank* bears out that statement:

Q. [By defendant's counsel] You haven't discussed the standard of care in particular with any doctors that practice in the area?

A. [By Dr. Blaisdell] No sir.

Q. Okay. You're not familiar with the emergency room procedures at the East Shoshone Hospital that were in effect in February of 1982 are you?

A. Not in any detail, no sir.

Deposition of Dr. Blaisdell, at 61. Consequently, [the Court] agree[d] with the trial court that as a matter of law plaintiffs' expert was not familiar with the applicable standard of care.

*Frank,* 114 Idaho at 481, 757 P.2d at 1200.

Likewise, in *Dekker* this Court stated: "The affiants practice in Salt Lake City, and there is no indication in the record that they possess any knowledge of the standard of care in the area served by the Magic Valley Regional Medical Center. It is sufficient to say that the affidavits of the plaintiffs' experts in no way demonstrate any such familiarity." *Dekker,* 115 Idaho at 334, 766 P.2d at 1215.

In *Pearson v. Parsons,* 114 Idaho 334, 337, 757 P.2d 197, 200 (Idaho 1988), this Court held that defendant's two expert affidavits in support of defendant's motion for summary judgment were "both devoid of statements indicating actual knowledge of the standard of practice in the Blackfoot community." Defendants then argued that plaintiff's expert, Dr. Weeks', affidavit also failed to satisfy the actual knowledge test of I.C. § 6–1013. However, with respect to plaintiff's expert affidavit this Court stated: "He possessed professional knowledge and expertise coupled with actual knowledge of the applicable ... community standard to which his ... expert opinion testimony is addressed. I.C. § 6–1013(c). I am also familiar with the standards of the community regarding the diagnosis and treatment of suspected and actual appendicitis." Thus, this Court, in some of the above cited cases, has rejected expert affidavits when there has been no attempt to inquire of the applicable standard. However, in *Pearson* this Court stated that plaintiff's expert affidavit satisfied the requirements of I.C. § 6–1013 even though the expert only stated that he was familiar with the applicable community standard.

The case of *Strode v. Lenzi,* 116 Idaho 214, 775 P.2d 106 (1989), a more recently decided case, can also be distinguished for the same reasons. In *Strode* this Court held that plaintiff's expert affidavit failed to show that the expert was familiar with

the applicable standard. The expert made no attempt to inquire of a local doctor as to the standard of care. The expert affidavit stated:

> The standard of care for a board certified orthopedic surgeon in Boise is that set by the American Academy of Orthopedic Surgeons and is the same standard under which I practice in Chicago, Illinois. I am, therefore, familiar with what is expected of a board certified orthopedic surgeon in Boise.

*Strode,* 116 Idaho at 215, 775 P.2d at 107. This Court upheld the *Buck* rule, stating the following:

> If he is board certified in the same specialty, he must, at a minimum, inquire of a local specialist to determine whether the local community standard varies from the national standard for that board certified specialty.... Dr. Hall's affidavit shows no effort to obtain information regarding the local standard of care and, as the trial court noted, are conclusory statements which are incapable of objective evaluation by anyone.... Consequently, there was no showing of a genuine issue of fact which must be tried. *Buck v. St. Clair,* 108 Idaho 743, 702 P.2d 781 (1985).

*Strode,* 116 Idaho at 216, 775 P.2d at 108.

In the case at bar Dr. Tune made the inquiry and received the reply that the standard throughout Idaho was the same as the national standard. Dr. Tune testified that the standard hadn't changed since before 1983, and that it was classic text book, medical school learning. Dr. Boe testified that he learned of this standard during residency. Dr. Boe also testified as to what the standard was, showing that the standard in Pocatello in 1983–84 was the same as the national standard for diagnosing urinary tract infection or obstruction. Dr. Groberg and Dr. Davis stated they were aware of the applicable standard in 1983 in their affidavits. Therefore, Dr. Tune should not have been disqualified. If anything, his testimony is subject to cross examination and the credibility of his knowledge of the applicable standard in this case can be weighed by the jury. *See*

*Brown v. Colm,* 11 Cal.3d 639, 114 Cal. Rptr. 128, 522 P.2d 688 (1974).

## PART V

### The Proper Standard of Review for a Directed Verdict

In *Gmeiner v. Yacte,* 100 Idaho 1, 592 P.2d 57 (1979), this Court addressed the issue of whether the trial court had erroneously granted a directed verdict. This Court cited a federal circuit court as follows:

> If the court grants it [a motion for directed verdict] no findings of fact are necessary and upon review the evidence must be viewed in the light most favorable to the party against whom the motion is made.... We will therefore ... disregard the findings of fact of the trial court, reviewing the entire evidence in the light most favorable to the plaintiff and giving him the benefit of all reasonable inferences which may be deduced from the evidence in his favor ... To adopt any other view in a jury case is to risk the deprivation of a plaintiff's right to trial by jury under the Seventh Amendment.

*O'Brien v. Westinghouse Elec. Corp.* 293 F.2d 1, 9–10 (3d Cir.1961). We went on to state the following:

> The task of the appellate court remains the same, namely, to determine whether plaintiff's evidence was sufficient to survive defendant's motion for a directed verdict and to justify submitting the case to the jury, i.e., whether, as a matter of law, plaintiff produced sufficient evidence (not a mere scintilla) from which reasonable minds could conclude that a verdict in favor of the plaintiff was proper.

*Gmeiner,* 100 Idaho at 4, 592 P.2d at 61.

Additionally, in *All v. Smith's Management Corp.,* 109 Idaho 479, 480, 708 P.2d 884, 885 (1985), this Court stated that "[a] party who moves for a directed verdict pursuant to I.R.C.P. 50(a) necessarily admits the truth of the adverse evidence and every inference that may legitimately be drawn therefrom in the light most favorable to the opposing party. *Stephens v. Stearns,* 106 Idaho 249, 252–53, 678 P.2d 41, 44–45; *Owen v. Burcham,* 100 Idaho 441, 447, 599 P.2d 1012, 1018 (1979)." Justice Shepard authored the unanimous opinion in *Owen.* Justice Donaldson authored the unanimous opinion in *Stephens,* and also authored the Court's opinion in *All.*

In the case at bar, plaintiffs did present sufficient evidence to establish a *prima facie* case. The trial court failed to view the evidence in the light most favorable to plaintiffs and to allow every inference that could be deduced from the facts and evidence to be appropriately weighed in plaintiffs' favor when it considered the motion. Plaintiffs directly examined both Dr. Tune and Dr. Boe. Dr. Boe was examined as to the standard of care in Pocatello in 1983–84 with respect to plaintiffs' factual situation.

There are at least four instances in which defendant Dr. Boe testified to having breached the very standard about which he testified. First, Dr. Boe testified that the standard required him to read a nurse's notes about a patient. However, Dr. Boe never read the note, and even though Jake Gubler was his patient during this whole course of time, Dr. Boe never became aware of the nurses' note. Secondly, Dr. Boe testified that the standard required a doctor to be responsible for lab work ordered for a patient. However, Dr. Boe never saw the SMAC test results he ordered for Jake Gubler. Thirdly, Dr. Boe testified that the standard required a doctor to review the entire SMAC test results. However, Dr. Boe never discovered the entire results of the SMAC test ordered for Jake Gubler. Finally, Dr. Boe testified that the standard required lab work test results to be sent to a patient's chart. However, the SMAC test results ordered by Dr. Boe for plaintiff never made it to Jake Gubler's chart.

Besides these readily apparent breaches of the applicable standard, plaintiffs attempted to further show at trial three other violations of the standard of care. The trial court disqualified Dr. Tune from testifying as to the standard of care, but initially allowed Dr. Tune's testimony to continue

as to the issue of causation. This would have allowed Dr. Tune to testify as to his opinion about plaintiff's enlarged bladder, urinalysis and SMAC test results. However, the trial court then decided that Dr. Tune could not even testify as to causation. Dr. Tune was prevented from testifying altogether. The court *required* plaintiffs' counsel to make an offer of proof as to anything Dr. Tune or Dr. Brewer would have testified to with respect to issues other than the applicable standard of care. In plaintiffs' offer of proof counsel stated that he intended to use the testimony of Dr. Tune and Dr. Brewer to establish certain factual predicates which used in conjunction with Dr. Boe's testimony would establish a violation of the standard.

First, Dr. Tune and Dr. Brewer would have testified to the fact that plaintiff's bladder was enlarged or palpable and that an observer could feel the bladder in October, 1983, as the nurse had, and that this combined with Dr. Boe's testimony that the standard of care would have required further investigation, is sufficient to show a violation of the standard of care in Pocatello in 1983. Second, Dr. Tune and Dr. Brewer would have testified that the urinalysis taken on October 25, 1983, was indicative or suggestive of a urinary tract infection, contrary to what Dr. Boe testified to, and combining this with Dr. Boe's testimony that suspicion of a urinary tract infection in a boy that age needed to be investigated and followed up in order to comply with the local standard of care in 1983 is sufficient to show a violation of the applicable standard in 1983. Third, Dr. Tune and Dr. Brewer would have testified that the SMAC test done on plaintiff showed abnormal results and that combining this with Dr. Boe's testimony, that the standard of care required these elevated results of the SMAC test to be followed up shows a violation of the standard in Pocatello at that time.

With respect to the enlarged bladder, the trial court stated that Dr. Boe did not see the nurses' note about the enlarged bladder and that because of this there was no evidence of any violation of the standard. However, not only did Dr. Brydon, who is a doctor with defendant clinic, see the note, but, as has been stated previously, Dr. Boe had already testified that the standard required a doctor to read a nurses' notes about a patient. Dr. Boe also testified, as stated previously, that he never saw the nurses' note about plaintiff's enlarged bladder even though plaintiff was his continuing patient. Plaintiff was admitted to the hospital and Dr. Boe was his attending physician. Dr. Boe returned to hospital duty on October 30, 1983. Plaintiff was discharged the next day and saw Dr. Boe a week later on November 8, 1983. Dr. Boe never saw the nurses' note. This combined testimony shows a violation of the standard of care in Pocatello in 1983.

With respect to the urinalysis, the trial court decided that absent testimony that Dr. Boe's conclusion that the urinalysis results were not abnormal was a violation, evidence of a violation was lacking. However, Dr. Tune and Dr. Brewer would have testified that the urinalysis results were abnormal and indicative of a urinary tract infection. Combining this testimony with Dr. Boe's testimony that indication of a urinary tract infection required further investigation shows evidence of a violation. It is enough of an issue of fact to get to the jury and let the jury decide which expert to believe.

With respect to the SMAC test results, the trial court decided that absent testimony that Dr. Boe was responsible for seeing all the results, evidence of a violation was lacking. However, as stated previously, Dr. Boe had testified that a doctor was responsible for the lab work ordered for a patient and that the standard required a doctor to review the entire results of a SMAC test ordered. Dr. Boe also testified, as stated previously, that he never received the results of the SMAC test and that he never reviewed the results of the test, and never asked what all the results were. Therefore, this is evidence of a violation.

Thus, even though plaintiffs' experts were prevented from testifying, there is still ample evidence of a violation of the applicable standard in 1983–84. The trial court should have let the jury weigh the

evidence. Plaintiffs' counsel directly examined both Dr. Boe and Dr. Tune. Plaintiffs' counsel elicited direct expert testimony showing evidence of a violation of the applicable standard in 1983–84.

In *Gmeiner v. Yacte,* 100 Idaho at 9, 592 P.2d at 65, this Court stated that although a trial court has power under I.R.C.P. 50(a) to grant a directed verdict at the close of plaintiff's case, *the preferred practice* is to defer a ruling upon the motion until both sides have finally rested; moreover, "even at the close of all the evidence, it may be desirable to refrain from directing a verdict though it would be possible to do so."

In *Fitzgerald v. Walker,* 113 Idaho 730, 732–33, 747 P.2d 752, 754–55 (1987), this Court reversed a directed verdict because the plaintiffs were not given the opportunity to present all of their case. The trial court granted the directed verdict since plaintiffs were without an expert witness on the first day of trial.[9] In reversing the trial court and remanding for further proceedings, Justice Donaldson wrote:

> [T]he rules of civil procedure provide remedies. A court may impose sanctions where pleadings or motions have been interposed for delay or other improper purposes, I.C.R.P. 11(a)(1) (Supp.1986), and sanctions for violations of discovery orders are provided for in I.R.C.P. 37(e). Violations of scheduling or pretrial orders are also subject to sanctions.

I.R.C.P. 16(a). Finally, a failure to prosecute or a failure to comply with an order of the court or the rules of civil procedure may warrant dismissal under I.R.C.P. 41(b).

These discretionary tools exist for the use of trial courts, but they must be used judiciously and for proper purposes. As has been said, the goal is not expediency for its own sake:

> Courts exist to serve the parties, and not to serve themselves, or to present a record with respect to dispatch of business. Complaints heard as to the law's delays arise because the delay has injured litigants, not the courts. For the court to consider expedition for its own sake "regardless" of the litigants is to emphasize secondary considerations over primary.

*Alamance Industries, Inc. v. Filene's,* 291 F.2d 142, 146 (1st Cir.1961) (footnote omitted), *cert. denied* 368 U.S. 831, 82 S.Ct. 53, 7 L.Ed.2d 33 (1961).

Also, though 'burgeoning filings and crowded calendars have shorn courts of the luxury of tolerating procrastination,' *Chira v. Lockheed Aircraft Corp.,* 634 F.2d 664, 668 (2nd Cir.1980), the 'laudable objective [of reducing the congestion in court dockets] should not be sought in a way which undercuts the very purposes for which courts were created—that is,

---

9. The underlying circumstances in *Fitzgerald v. Walker* are on all fours with the instant case. Lifting them from the forepart of the Court's opinion they are:

(1) The case was set for jury trial;

(2) The case required testimony from expert witnesses;

(3) Plaintiffs advised that a Mr. Green from Oregon would appear at trial as a plaintiffs' expert;

(4) Three weeks before trial plaintiffs informed defense counsel that Mr. Green was unavailable, and a Boise attorney would be plaintiffs' expert;

(5) While the jury was being selected plaintiffs' expert witness passed a message to plaintiffs' counsel that he would be unable to testify;

(6) Because plaintiffs had no backup expert witness, they moved for a continuance so that they could obtain a new expert;

(7) Alternatively, if a continuance were not granted, plaintiffs' counsel asked for a recess, and if that were not granted, he sought leave to proceed with this case;

(8) The court denied a continuance or a recess, and dismissed plaintiffs' case with prejudice; and

(9) The Boise expert witness gave an affidavit stating his reason for not testifying was that he was not furnished the materials needed to review the allegations of malpractice until the day before trial.

The issue drawn, as stated in the opinion was framed to be: Whether the trial court abused its discretion, or made an error of law, in dismissing plaintiffs' case with prejudice for their failure to have an expert ready to testify in a legal malpractice action. 113 Idaho at 732, 747 P.2d at 754. There could not be two more similar cases than *Fitzgerald* and *Gubler*. With precedent of recent vintage before us, we, as a court, can command little respect for the virtue of consistency if the trial court's directed verdict in this case is not reversed and the cause remanded for a new trial.

to try cases on their merits and render judgments in accordance with the substantial rights of the parties.' [*Link v. Wabash RR Co.*, 370 U.S. 626, 82 S.Ct. 1386 at 1398, 8 L.Ed.2d 734 (1962) (Black, J. dissenting, joined by Chief Justice Warren.) Justices White and Frankfurter did not participate.]

Lastly where dismissal with prejudice is contemplated, a court must exercise caution and make appropriate findings:

Dismissals with prejudice are 'reserved for the most egregious of cases usually where the requisite factors of clear delay and ineffective lesser sanctions are bolstered by the presence of at least one of the aggravating factors.' *Rogers v. Kroger*, 669 F.2d (317) at 320 (5th Cir.1982). *Jones v. Caddo Parish School Bd.*, 704 F.2d 206 (5th Cir.1983). Those aggravating factors include (1) delay resulting from intentional conduct, (2) delay caused by the plaintiff personally, and (3) delay causing prejudice to the defendant. *Morris v. Ocean Systems, Inc.*, 730 F.2d 248 (5th Cir.1984).

In addition to the foregoing, the court must consider lesser sanctions. That consideration, and the court's findings that lesser sanctions would be inadequate, must be spread upon the record for 'such findings of fact are essential for our consideration of the inevitable argument that the dismissal was an abuse of its discretion.' *Hornbuckle v. Arco Oil & Gas Co.*, 732 F.2d 1233, 1237 (5th Cir.1984). In *Rogers*, 669 F.2d at 321–22 we noted several such lesser sanctions which might be considered: 'Assessments of fines, costs, or damages against the plaintiff or his counsel, attorney disciplinary measures, conditional dismissal, dismissal without prejudice, and explicit warnings are preliminary means or less severe sanctions that may be used to safeguard a court's undoubted right to control its docket.'
*Boudwin v. Graystone Ins. Co., Ltd.*, 756 F.2d 399, 401 (5th Cir.1985) (reviewing dismissal pursuant to Fed. R.Civ.P. 41(b)).

*Fitzgerald*, 113 Idaho at 732–33, 747 P.2d at 754–55. Clearly, this Court subscribed to the wisdom of Justice Black, and in relying on his opinion, adopted the language which this Court quoted. Attached as Appendix A to this opinion is a copy of the content of the trial court's order which this Court reversed in *Fitzgerald.*

The Gublers' brief brings our attention to two cases where this Court over thirty-five years ago committed to the reversing of dismissals entered following a district court's refusal to grant a requested continuance, finding that in both instances the lower court did not properly guide its discretion. In *Finch v. Wallberg Dredging Co.*, 76 Idaho 246, 281 P.2d 136 (1955), the Finches were seeking damages from Wallberg for deficiencies in a dredge which they had purchased. To the district court's apparent disapproval, at least three trial settings had been vacated by agreement of counsel. Four days before a final trial setting date, counsel for Wallberg withdrew. The Finches were able to obtain new counsel, a Mr. E.G. Elliott, who promptly moved for a continuance of the trial setting in order to become prepared for trial. The trial judge refused to grant any continuance, to which Mr. Elliott responded that he could not proceed to trial, being not informed or familiar with any of the facts, "it would be a farce for me to attempt it and an imposition on the court." The court then granted defendant Wallberg's motion to dismiss. The Supreme Court on appeal after stating the factual posture of the case, ruled that the lower court should not have permitted withdrawal of plaintiffs' counsel under those circumstances, and reversed, ordering that the Finch complaint be reinstated. The opinion authored by Justice Smith was unanimous. It pointedly stated that a motion for a continuance is within the discretion of the trial court, but that the discretion "must not be exercised oppressively, arbitrarily, or capriciously, 17 C.J.S., Continuances, § 5, p. 193; *Eckert v. Graham*, 131 Cal. App. 718, 22 P.2d 44; *Baker v. Jensen*, 135 Or. 669, 295 P. 467; *Elliott v. Lawson*, 87 Or. 450, 170 P. 925." *Finch*, 76 Idaho at

250, 281 P.2d at 140. That language plainly conveyed the court's view that the motion for a continuance was denied "oppressively, arbitrarily, or capriciously," and most likely all of the above, assuming that there are fine lines of distinction.

In *Pauley v. Salmon River Lumber Co.*, 74 Idaho 483, 264 P.2d 466 (1953), the scenario was much the same. Judge Koelsch denied a plaintiff's motion for a continuance and dismissed for lack of prosecution, after he first denied plaintiff Pauley a continuance based on his inability to go to trial without the deposition testimony of a Mr. Meisner who lived in California and who had been unable to attend a deposition to be taken in Stockton, California, all of which was supported by the affidavit Dr. Ben Boice, Meisner's attending California physician. After the district court entered judgment of dismissal for lack of prosecution, in due time it also denied and overruled plaintiff Pauley's motion to set aside the dismissal and to reinstate the cause. The Idaho Supreme Court, per Chief Justice Porter, unanimously found that the showing made by appellant (Pauley) on the motion to vacate the default judgment of dismissal reasonably meets all of the tests that have been applied to the adequacy of such a showing by this Court: "We conclude that it clearly appears that this trial court abused its discretion in denying the motion to vacate the default judgment of dismissal and to reinstate the cause."

Against that backdrop, we are asked to measure the conduct of the trial judge in the instant case under the same circumstances. Here, as in *Fitzgerald, Finch,* and *Pauley,* the trial court ruled the plaintiffs' expert witness not qualified to testify whether or not the defendant doctor violated the applicable community standard of care in 1983. Plaintiffs moved the court for a continuance to allow plaintiffs to further qualify their expert witness. The trial court denied the continuance, stating over six months later in the Memorandum Decision and Order which was a denial of plaintiffs' motion for a new trial or to alter or amend the judgment that: "After considering the impact which this would have upon the jury and the fact that defense counsel would undoubtedly request an opportunity to redepose Dr. Tune based upon this change in circumstance, the Court denied plaintiffs' motion." R. 150. Nothing, however, serves to explain or even suggest how the jurors would have been "impacted" simply because a witness who had testified was recalled to the stand for further questioning. Moreover, the court's second assertion regarding a potential defense request for an opportunity to redepose Dr. Tune was nothing but speculation—sheer surmise. ·

The trial court's denial of a continuance does not measure up to the likes of *Fitzgerald, Finch,* and *Pauley.* Unless this Court can say that those three decisions were incorrect, this *Gubler* case should be sent back for a new trial. The trial judge, in that same Memorandum Decision and Order of July 18, 1989, candidly conceded to being worried as to not giving the requested continuance:

> The court notes that the affidavit of Dr. Davis indicates that Dr. Tune could have been properly qualified to testify during this proceeding had he contacted Dr. Davis, rather than Dr. Groberg. This raises a concern that the plaintiffs in this matter were prevented from having their case submitted to a jury because of this oversight by counsel. To prevent a possible miscarriage of justice, the court has given serious consideration to granting a new trial, conditioned upon plaintiffs' counsel paying all attorney fees and costs incurred by the defendant immediately before and during the trial. While this would undoubtedly be a substantial sum, it would seem to be an appropriate method of preventing a possible injustice to the plaintiffs and an unjustified expense or inconvenience to the defendant. However, the court is unable to find any provision in Rule 59(a) or (e) which would allow the court to grant a new trial to avoid what may be a miscarriage of justice.

R. 157–58. There is no doubting the sincerity of those remarks, nor that the district court agonized over the reality that his denial of what likely would have been a

continuance of two hours at most was going to cause a miscarriage of justice. Whenever the judicial system malfunctions with the result that an eight-year old boy is not allowed to put his case in the hands of a jury, there is a denial of a constitutional right, and there is a miscarriage of justice. If that were not entertained as a firm belief then this one justice could have better spent the last seven working days at some other activity.

Obviously, the district court was inclined to preclude a miscarriage of justice failing to understand that he would not be violating any rules. But it has never been doubted that "these rules shall be liberally construed to secure the *just* determination of every action and proceeding." I.R.C.P. Rule 1(a) (emphasis added). This Court stated in *Sines v. Blaser*, 98 Idaho 435, 439, 566 P.2d 758, 762 (1977) that: "Rule 1, I.R.C.P. is a constant reminder that the rules are to be liberally construed, and a *just result is always the ultimate goal to be accomplished.*" (Emphasis added.) Does anyone have a recollection of ever seeing an appellate decision which reversed a trial court for construing any rule of procedure liberally in attempting to accomplish a just result? In fact, I would go so far as to say that even without the benefit of Rule 1 and the *Sines* statement, courts have an inherent power to accomplish justice. It was so before Rule 1, and that rule in fact embodied the common law rule. Accomplishing justice is the fundamental reason for the existence of courts. Otherwise put, preventing miscarriages of justices is inherently within the province of a district court.

In the instant case there may have been a mistake made by the attorneys in presenting Jake Gubler's severe permanent injury case, and the district court recognized it: "because of this oversight by counsel." R. 158. However, that oversight was recognized after Dr. Boe had testified and when Dr. Tune was on the stand. Counsel's efforts to correct the oversight were, generally speaking, stonewalled by the district court. Those efforts consisted of placing Dr. Tune again in contact with Dr. Groberg for further discussion of the standard of care in the Pocatello community. The district court observed, six months after the trial, that Dr. Tune was precluded from testifying as an expert only because he had not asked Dr. Groberg if the standard of care in 1983 and 1984 was the same as in 1988, when the two doctors had their discussion. The district court ignored the statement to the effect that there had been no deviation in the standard of care in twenty years.

More disturbing to the plaintiffs and their counsel than that, will be when they read the Court's opinion, in that there has seemingly been no reading of the briefs or the appeal record by those in the majority. A large share of the plaintiffs' brief explains why their ouster was erroneously given to defendants on a motion for directed verdict, but this Court writes of a dismissal with prejudice, which simply never happened.

BOYLE, Justice dissenting.

I respectfully dissent from the majority opinion. In my view an analysis of the record satisfies me that adequate foundation as to the applicable standard of health care in Pocatello was laid by the combined testimony of the defendant physician and the expert witness. When the testimony and evidence in the record is considered as a whole and in its entirety, adequate foundational evidence was presented to establish a prima facie case as to the applicable standard of health care.

Although there is substantial evidence in the record to support this premise, none is more direct and poignant than the following dialogue from the testimony of the defendant physician:

Q. In fact, if a physician in this community saw that lab result on a three-and-a-half-month-old baby, the standard of care would have required that he investigate the cause of that, correct?

A. Yes.

Q. If you had investigated the cause of Jake's elevated BUN and creatinine in November and found that it was due to

posterior urethral valves, what would you have done?

A. I would have sent the baby to Salt Lake City for further evaluation and treatment.

In my view the foundational requirements of I.C. §§ 6–1012 and 6–1013 and our case law as to establishment of the standard of health care had been satisfied and the expert witness should have been allowed to express an opinion as to the defendant physician's alleged failure to meet that standard.

Accordingly, I respectfully dissent.

BISTLINE, J., concurs.

## APPENDIX A

From *Fitzgerald v. Walker*, 113 Idaho 730, 747 P.2d 752 (1987).

Order of Dismissal with Prejudice

Trial of this case commenced on July 16, 1986. During voir dire examination of the jury the Court was advised that the Plaintiffs did not have an expert to testify regarding the claimed attorney malpractice in this case. The court finds as follows:

1. All parties had informed this Court that they were ready to proceed with trial as scheduled.

2. The Court was ready to proceed with trial. Jury selection had in fact commenced.

3. The trial date had been set for almost a year.

4. The Court recognizes the emotional strain involved in preparing for trial and the impact on the parties and witnesses involved.

5. The Court recognizes that when one party is given the chance to have its matter tried other litigants do not have the benefit of the Court's time.

6. It would be unfair to postpone the trial because there are other proceedings set to commence on Monday, July 21, 1986, involving persons in custody and a trial involving the death of seven persons and numerous out of state witnesses set to begin July 22, 1986, backed up by a dental malpractice case involving out of state witnesses.

7. There has been no excuse or compelling circumstance why the matter could not be tried now, such as any sickness, accident or unavoidable difficulty that would make it unjust to dispose of the case at this time.

8. On July 18, 1985, this Court filed and served on the parties a Notice of Jury Trial and Order Governing Further Proceedings to control the course of trial preparation. The Court has not been advised of any good cause or compelling reason why this Order should not be enforced and complied with.

9. Any continuation of this case would mean discovery would be reopened when the time for discovery has clearly passed, and would mean that there would possibly be new witnesses, depositions and rebuttal evidence and new issues brought up.

10. Plaintiffs have made a judicial admission that they do not have a prima facie case at this time against Defendant since they have no expert opinion that the Defendant's conduct fell below the standard of practice or that the Defendant's conduct caused any damage.

Based on the above findings, and the matters discussed in open court, and in the interest of justice IT IS HEREBY ORDERED, ADJUDGED and DECREED that the Plaintiffs' action against the Defendant is dismissed with prejudice. Costs to the defendants.

*Fitzgerald v. Walker*, 113 Idaho at 731 n. 1, 747 P.2d at 753 n. 1.