828 P.2d 854

Krzysztof KOZLOWSKI, as personal representative of the Estate of Zofia M. Skiba and Piotr Skiba as the natural father and next friend of Stephanie Skiba, a minor, Plaintiffs–Appellants–Cross Respondents,

v.

Dr. Robert RUSH, Defendant–Respondent,

and

Bannock Regional Medical Center and Bannock County d/b/a Bannock Regional Medical Center, Defendants–Respondents–Cross Appellants.

No. 18718.

Supreme Court of Idaho, Boise, September 1991 Term.

March 20, 1992.

**826**

Kenneth S. Cohen, Jackson, Wyo., Gaucahy, Simpson & Gardner, Idaho Falls, and Meyer & Williams, Jackson, Wyo., for plaintiffs-appellants-cross respondents. P. Richard Meyer, argued.

Hall, Farley, Oberrecht and Blanton, Boise, for defendant-respondent Robert Rush, M.D. Richard E. Hall, argued.

Moffatt, Thomas, Barrett, Rock and Fields, Idaho Falls, for defendants-respondents-cross appellants Bannock Regional Medical Center and Bannock County. Gary T. Dance, argued.

BISTLINE, Justice.

This case involves an allegation of medical malpractice against Dr. Robert Rush, M.D. ("Rush"), Bannock Regional Medical Center and Bannock County ("Bannock"). The plaintiffs allege that Rush's and Bannock's negligence prior to and during the delivery of Stephanie Skiba resulted in brain damage to Stephanie. The plaintiffs in the actions are Stephanie Skiba, Piotr Skiba, the father and next friend of Stephanie, and Krzysztof Kozlowski, the personal representative of the estate of Zofia Skiba (Stephanie's mother) ("the Skibas").

When Zofia M. Skiba became pregnant she was forty, overweight, and had been fighting cancer for many years. When she was admitted to the hospital prior to delivery she was seen by Rush. Two weeks prior, Rush had undergone surgery on his right shoulder. Rush was advised to avoid active abduction and flexion for six weeks. He appeared at the hospital with his arm in a sling and had to take the arm out of the sling before he could use the forceps which were required to deliver Stephanie.

Rush failed to detect that Stephanie would be an extraordinarily large (macrosomic) baby. Macrosomic babies are at a high risk for injury during the birth process. A problem known as shoulder dystocia occurred during the delivery.

Shoulder dystocia occurs when the baby's head is delivered, but its shoulders are too big to come out. Stephanie was born "dusky" or "blue" in color and required "bagging" with oxygen. Shortly after birth, she developed tremors in the left hand, respiratory neurosis, and left facial palsy. Nevertheless, Stephanie was allowed to go home with her mother.

Later Stephanie had a seizure and was admitted to the hospital. Thereafter, she was diagnosed as having permanent and irreversible brain damage.

The plaintiffs presented evidence that the brain damage was caused by the birth trauma. The plaintiffs' expert testified that Rush's actions fell below the local area standard of care by failing to follow Zofia's pregnancy more carefully. In particular, Rush failed to assess the fetal condition prior to labor by means of a biophysical profile and failed to determine the size of the fetus by using ultrasound technology. If he had done so, he would have known Stephanie was macrosomic and could have taken steps to avoid the shoulder dystocia, possibly by delivering Stephanie by cesarean section. The opinion of the plaintiffs' expert was that Rush was not capable of performing a cesarean section himself because of his recent shoulder surgery.

Rush and Bannock presented evidence that the damage occurred prior to birth, probably sometime between the 24th to 35th weeks of gestation. Moreover, Rush testified that his shoulder injury did not affect his ability to delivery Stephanie. Both Rush and a nurse who was present during the delivery testified that there were no signs which called for the administration of oxygen to the mother.

After a three and one half week trial, a jury returned a verdict in favor of Rush and Bannock, finding no negligence on the part of either party. The Skibas filed a motion for judgment n.o.v., or in the alternative, for a new trial. The trial judge issued a memorandum ruling denying the motions.

The Skibas appeal from the judgment and the denial of the motion for a new trial.

Bannock appeals from the trial court's refusal to award it costs and from the order awarding costs to the Skibas.

ISSUE 1. DID THE TRIAL COURT ABUSE ITS DISCRETION BY STRIKING THE TESTIMONY OF THE SKIBAS' EXPERT WITNESS REGARDING THE NEED FOR ULTRASOUND AND/OR BIOPHYSICAL TESTING?

The Skibas argue that the district court erred by striking their expert's testimony that the local standard of care was violated when Rush failed to determine that Stephanie was a macrosomic baby which could have been accomplished by the use of ultrasound or biophysical testing. We review challenges to evidentiary rulings under the abuse of discretion standard. *State v. Terry*, 98 Idaho 285, 287, 561 P.2d 1318, 1320 (1977).

The court struck the testimony because it found that the Skibas' expert had not familiarized himself with and did not establish what the local standard of care was in Pocatello at the time of Stephanie's birth. We are not persuaded.

The relevant statutes are I.C. § 6–1012 and § 6–1013 which provide:

**6–1012. Proof of community standard of health care practice in malpractice case.**—In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care, including, without limitation, any dentist, physicians' assistant, nurse practitioner, registered nurse, licensed practical nurse, nurse anesthetist, medical technologist, physical therapist, hospital or nursing home, or any person vicariously liable for the negligence of them or any of them, on account of the provision of or failure to provide health care or on account of any matter incidental or related thereto, such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence of such physician and surgeon, hospital or other such health care provider and as such standard then and there existed with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning. Such individual providers of health care shall be judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any. If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered. As used in this act, the term 'community' refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided.

**6–1013. Testimony of expert witness on community standard.**—The applicable standard of practice and such a defendant's failure to meet said standard must be established in such cases by such a plaintiff by testimony of one (1) or more knowledgeable, competent expert witnesses, and such expert testimony may only be admitted in evidence if the foundation therefor is first laid, establishing (a) that such an opinion is actually held by the expert witness, (b) that the said opinion can be testified to with reasonable medical certainty, and (c) that such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable said community standard to which his or her expert opinion testimony is addressed; provided, this section shall not be construed to prohibit or otherwise preclude a competent expert witness who resides elsewhere from adequately familiarizing himself with the standards and practices of (a particular) such area and

thereafter giving opinion testimony in such a trial.

Since the passage of these statutes in 1976, this Court has had several occasions to construe their meanings, of which *Buck v. St. Clair*, 108 Idaho 743, 746–47, 702 P.2d 781, 784–85 (1985), was a forerunner. Therein we said:

> I.C. § 6–1013 also provides that a competent expert witness who resides elsewhere can testify if he has adequately familiarized himself with the local standard of care. The trial court ruled that Dr. Broms had not adequately familiarized himself with the local standard of care for Boise. We believe this was incorrect. By virtue of their training, board-certified specialists are familiar with the local standard of care which is equivalent to the national standard of care. *In order to meet the requirement of I.C. § 6–1013(c) showing adequate familiarization a specialist must demonstrate two elements: first, that he is board-certified in the same specialty as that of the defendant-physician; this demonstrates knowledge of the appropriate standard of care of board-certified physicians practicing in the specialty in question. Second, an out-of-the-area doctor must inquire of the local standard in order to insure there are no local deviations from the national standard under which the defendant-physician and witness-physician were trained.* In the instant case, Dr. Broms testified that he was a board-certified obstetrician-gynecologist, that he was familiar with the standard of care through regular reading of regional and national medical journals, and that he was familiar with the local standard of care. Dr. Broms obtained his familiarity with the local standard through his specialty training combined with his questioning of Dr. Roberge, a Caldwell board-certified obstetrician-gynecologist who told Dr. Broms that the local standard of care was equivalent to the national standard of care. At that point Dr. Broms possessed actual knowledge of the applicable said community standard as required by I.C. § 6–1013(c). Furthermore, we believe this degree of inquiry was adequate. Had Dr. Broms been told there was not a uniform standard, then further investigation would have been merited. However, Dr. Broms had every reason to believe the statement of a Caldwell obstetrician-gynecologist that there was a national standard of care for physicians practicing in this specialty. Upon learning this, further inquiry was not warranted.

> Subsection (c) of I.C. § 6–1013 specifically provides that this section shall not be used to prohibit or preclude a competent witness from adequately familiarizing himself with the standards and practices of an area. Dr. Broms testified he was a board-certified obstetrician-gynecologist who had inquired of a local board-certified obstetrician-gynecologist who told him the local standard was the same as the national standard. Hence, his testimony should not have been precluded. Dr. Broms demonstrated his familiarity with the specialty and with the local standard of care which does not deviate from the national standard of care for this specialized area of practice. Nothing more needed to be done to qualify Dr. Broms' testimony.

*Buck*, 108 Idaho at 746, 702 P.2d at 784 (emphasis added).

Although limited by subsequent decisions, the holding in *Buck* has not been overruled. Even though some of *Buck* was characterized as dicta in *Grimes v. Green*, 113 Idaho 519, 522, 746 P.2d 978, 981 (1987), the italicized portion of the quote above was quoted by the Court as being the core holding of *Buck*.[1] *Grimes*, 113 Idaho at 521, 746 P.2d at 980.

This case is similar to *Buck*. Dr. Friedman, the Skibas' expert, was a board certified obstetrician-gynecologist ("ob-gyn") who was on a sabbatical leave from his position as the head of the Department of Obstetrics and Gynecology at the Beth Is-

---

1. The italicized portion was authored by Chief Justice Shepard, repeating what was written by Justice Bistline in *Buck*, joined by Justices McFadden and Huntley.

rael Hospital in Boston and his professorship at the Harvard Medical School. In an effort to determine the local area standard of care, he read the deposition of Rush, the depositions of several nurses, spoke to a board certified ob-gyn who was practicing in Pocatello at the same time Stephanie was born, and read the deposition of Dr. V. Gene Rufi who is another board-certified ob-gyn practicing in Pocatello.

The trial court in granting the defendants' motion to strike Friedman's testimony, held that the doctor's preparations did not show that he knew what the standard of care was in Pocatello in 1985 explaining tersely that "Dr. Rufi was asked many questions in his deposition ... but nowhere was he asked, that I know of, is this the standard in the community. The magic words."

In actuality, however, the transcript of Rufi's deposition clearly discloses that Rufi's testimony established that the local standard of care for board certified ob-gyns in Pocatello in 1985 was the same as the national standard:

> Q: In relation to the local standard of practice for board certified obstetricians as it existed at that time frame, i.e., what should a reasonable and prudent doctor with your specialty do under the same or similar circumstances, was that standard in any respect lower in this community than it was for board certified physicians practicing elsewhere, i.e. using the national standard?
>
> A: No.
>
> . . . .
>
> Q: ... Are you familiar with the Handbook of Standards by the American College of Obstetricians and Gynecologists?
>
> A: Yes.
>
> Q: And is that reflective of what the standard of practice was in this community in 1985?

A: Yes.[2]

Rufi Deposition, 7–8.

Friedman testified that he was also familiar with the above-mentioned Handbook of Standards and that, at the time Stephanie was born, Rush acted below the prevailing national standard of care for board certified ob-gyns because he failed to conduct a biophysical profile or use ultrasound to determine fetal size.

Thus, under *Buck* and the cases which follow it, the trial court erred in striking Friedman's testimony about the use of biophysical profiles and ultrasound. Friedman knew that Rufi stated in his deposition that the local standard of case in 1985 was the same as the national standard of care, with one irrelevant exception. Friedman had personal knowledge that in 1985 the national standard of care mandated the use of biophysical profiles and ultrasound in cases like the one at bar. This in combination was enough to lay the foundation for Friedman's opinion that Rush's treatment was below the local standard of care in Pocatello in 1985.

Bannock and Rush cite to those of our opinions wherein we held that a proper foundation for expressing an opinion as to the local standard of care had not been laid. In the cases of *Dekker v. Magic Valley Regional Medical Center*, 115 Idaho 332, 334, 766 P.2d 1213, 1215 (1988); *Frank v. East Shoshone Hosp.*, 114 Idaho 480, 481, 757 P.2d 1199, 1200 (1988); and *Pearson v. Parsons*, 114 Idaho 334, 337, 757 P.2d 197, 200 (1988), this Court held that the expert affidavits in question did not satisfy the foundational requirements of I.C. § 6–1012 and § 6–1013. However, those three cases are distinguishable in that the affidavits in question made *absolutely no reference to any knowledge of the applicable standard of care.* The expert doctors had not been prepared by involved counsel to inquire as to the applicable standard.

**2.** Later in the deposition, Rufi qualified his statement that there were no local exceptions to the national standard of care. He noted that it was not part of the local standard of care to be able to set up an operating room to perform a cesarean section within the board standard of thirty minutes. That standard was not always possible to meet because of a shortage of anestheologists. This single local deviation from the national standard of care is not relevant in this case.

The case of *Strode v. Lenzi*, 116 Idaho 214, 775 P.2d 106 (1989), can also be distinguished for the same reasons. In *Strode*, this Court held that plaintiff's expert affidavit failed to show that the expert had become familiar with the applicable standard. The expert made no attempt to inquire of a local doctor as to the standard of care. The expert affidavit stated:

> The standard of care for a board certified orthopedic surgeon in Boise is that set by the American Academy of Orthopedic Surgeons and is the same standard under which I practice in Chicago, Illinois. I am, therefore, familiar with what is expected of a board certified orthopedic surgeon in Boise.

*Strode*, 116 Idaho at 215, 775 P.2d at 107. This Court applied the *Buck* rule, stating the following:

> If he is board certified in the same specialty, he must, at a minimum, inquire of a local specialist to determine whether the local community standard varies from the national standard for that board certified specialty.... Dr. Hall's affidavit shows no effort to obtain information regarding the local standard of care and, as the trial court noted, are conclusory statements which are incapable of objective evaluation by anyone.... Consequently, there was no showing of a genuine issue of fact which must be tried. *Buck v. St. Clair*, 108 Idaho 743, 702 P.2d 781 (1985).

*Strode*, 116 Idaho at 216, 775 P.2d at 108.

The most recent decision of this Court dealing with I.C. § 6–1012 and § 6–1013 is *Gubler v. Boe*, 120 Idaho 294, 815 P.2d 1034 (1991). There, the majority stated it was clear that the plaintiff's expert, Dr. Tune, had only familiarized himself with the Pocatello community standard of care as of 1988, not 1983, the year of the alleged malpractice. The Court also rejected the appellants' argument that the combined testimony of the expert and the defendant doctor established the local standard of care. The Court noted:

> [T]here was no showing by direct expert testimony that, from the information that Dr. Boe had, his treatment of Jake Gubler violated the local standard of care. Nor was there any direct expert testimony that 'it was a violation of the standard of care for Dr. Boe not to be aware of these facts under the circumstances of the case,'....

*Gubler*, 120 Idaho at 298, 815 P.2d at 1038.

In this case, Friedman read the deposition of Rufi wherein Rufi said that the 1985 Pocatello standard of care was the same as the national standard of care with one irrelevant exception. Rufi had personal knowledge of this because he was practicing in the Pocatello area in 1985. Friedman testified that he was familiar with the national standard of care for board certified ob-gyns in 1985 and that under the national standards, because Rush should have been aware that Stephanie was a macrosomic baby, he should have taken appropriate measures to prevent shoulder dystocia. Because Friedman's efforts in becoming knowledgeable as to the requisite standard of care in the Pocatello community met the requirements of I.C. § 6–1012 and § 6–1013, we hold that the court abused its discretion by striking Friedman's testimony. Such error was prejudicial to the plaintiffs' case.

ISSUE 2. SHOULD THE TRIAL COURT HAVE PERMITTED VOIR DIRE EXAMINATION ABOUT THE EFFECT OF INSURANCE COMPANY ADVERTISEMENTS REGARDING THE SO-CALLED "MEDICAL MALPRACTICE CRISIS" ASSUMING THAT PLAINTIFFS MADE A SHOWING THAT THE JURY POOL MAY HAVE BEEN EXPOSED TO SUCH ADVERTISEMENTS?

In a question of first impression in Idaho, the Skibas argue that they should have been able to question the potential jurors on voir dire as to whether they had been exposed to any advertisements from insurance companies regarding the so-called "medical malpractice crisis" or "insurance crisis." The Skibas sought the court's permission to inquire of the potential jurors as to the extent of their exposure to insurance industry advertisements or articles. The request was based on their

assertion that the insurance industry had been attempting to influence public opinion with advertisements to the effect that verdicts favoring plaintiffs were causing insurance rates to rise, increasing the cost of medical care, and causing doctors to stop practicing medicine. The court deferred ruling on the motion and then later, in a written order, informed counsel "that plaintiffs may go into the subject of malpractice lawsuits, that fact and that fact alone. The plaintiff cannot go into the insurance crisis or even mention insurance." Upon the record before this Court, it is difficult to discern the basis of the trial court's ruling. The comments made during the argument on the motion indicate that the court denied the motion because it believed there was a blanket prohibition against any mention of insurance in front of the jury: "Well the problem I see, Mr. Meyers [plaintiffs' counsel], you know, in Idaho, it's pretty clear that there is not to be any mention of insurance during trial." Later, the following exchange occurred:

> THE COURT: I have always been of the opinion that counsel ought to have a pretty free rein in selecting a jury, because that's obviously a very critical stage of the trial, but the way our rules are now, I mean you go into this insurance business, then there isn't going to be a person in this courtroom, if they had any doubt that insurance coverage existed here, they won't after you get through questioning them.
>
> MR. MEYERS: I hope you believe me when I say that isn't my purpose.
>
> THE COURT: Well, I know it's not your purpose, but, you know until Idaho wants to recognize insurance, you know—I don't know what to do right now, so we'll take it up later.

There is no further discussion of the issue on the record; nor is there any indication that the subject was later taken up. A written ruling later issued by the court does not articulate the reason it denied the Skibas' motion.

■ The decision of the trial court in permitting or refusing the asking of questions relating to insurance companies is a matter of the court's discretion. Unless abused, that discretion will not be disturbed upon appeal. *Owen v. Burcham*, 100 Idaho 441, 444, 599 P.2d 1012, 1015 (1979).

Bannock and Rush argue we should follow the state courts which have forbidden such questioning or held the exclusion of such was not an abuse of discretion. *See, e.g. Maness v. Bullins*, 19 N.C.App. 386, 198 S.E.2d 752, 753 (1973) (error to allow such questioning when form of question clearly conveys information that defendant is insured); *Brockett v. Tice*, 445 S.W.2d 20, 22–23 (Tex.Civ.App.1969) (same as *Maness*); *Murrell v. Spillman*, 442 S.W.2d 590, 591 (Ky.Ct.App.1969) (no abuse of discretion in excluding such questioning); *Butcher v. Main*, 426 S.W.2d 356, 360 (Mo. 1968) (same as *Murrell*); *Speet v. Bacaj*, 237 Va. 290, 377 S.E.2d 397, 399 (1989) (no error in excluding questioning about insurance crisis because any mention of insurance in front of jury is forbidden); *Russo v. Birrenkott*, 770 P.2d 1335, 1338 (Colo.App. 1989) (no abuse of discretion in excluding such questioning); *Leonard v. Parrish*, 420 N.W.2d 629, 634 (Minn.App.1988) (same as *Russo*). The underlying rationale of all these cases is that such questioning improperly puts the question of whether the defendant is insured before the jury. The Skibas argue we should follow the recent Texas cases on the subject which have permitted such questioning. *Babcock v. Northwest Memorial Hosp.*, 767 S.W.2d 705 (Texas 1989); *National County Mut. Fire Ins. Co. v. Howard*, 749 S.W.2d 618 (Tex.App.1988), *reh'g denied* (1988). In *Babcock*, the court held that the refusal to allow the requested voir dire examination amounted to a denial of the plaintiff's constitutional right to a fair and impartial jury. 767 S.W.2d at 709. In *National County*, the court held it was not error for the trial court to have permitted such questioning. 749 S.W.2d at 621. The Skibas also argue that insurance companies should not be able to hide behind the rule prohibiting comments about insurance companies, while at the same time actively and substantially engaging in advertising with the

motive of influencing potential jurors in their favor.

We first note that the district court was mistaken when it stated that there is an absolute bar to evidence of insurance. I.R.E. provides:

**Rule 411. Liability insurance.**—Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or *bias or prejudice* of a witness. (emphasis added)

Even prior to the adoption of I.R.E. 411, we have held that evidence of insurance is admissible if it tends to show bias on the part of a witness. *Curtis v. Ficken*, 52 Idaho 426, 432, 16 P.2d 977, 978 (1932). We have also allowed evidence of insurance if relevant to prove a material issue in the case. *Brown v. Jerry's Welding & Construction Co.*, 104 Idaho 893, 896, 665 P.2d 657, 660 (1983); *Tucker v. Union Oil Co. of California*, 100 Idaho 590, 596, 603 P.2d 156, 162 (1979).

Although the Rules of Evidence are not applicable to voir dire examination, I.R.E. 411 expresses our recognition that the probative value of such evidence may outweigh its prejudicial effect when it is offered to show the bias or prejudice of a witness. If anything, the prejudicial effect of the admission of evidence that a party is insured is greater than the prejudicial effect of allowing a party to mention insurance advertisements during voir dire. The comments of counsel are not evidence and juries are instructed as to that fact as a matter of course.

In *Owen v. Burcham*, 100 Idaho 441, 599 P.2d 1012 (1979), an attorney asked prospective jurors whether they, or any of their relatives, were employed by or owned stock in any casualty insurance company.

We held that such voir dire examination was "permissible if made in good faith with the intent to expose bias and not for the purpose of informing the jury about the existence of the defendant's insurance." *Owen*, 100 Idaho at 444, 599 P.2d at 1015. *Owen* merely restated well-established law in Idaho going as far back as 1929:

The general rule is as stated in *Arnold v. California Portland Cement Co.*, 41 Cal.App. 420, 183 P. 171:

'It is entirely proper for counsel to ask the jurors such questions as may be reasonably necessary to ascertain whether they are free from a bias or interest that may affect their verdict. To this end, it is proper for counsel, in good faith, to ask of each juror whether he is interested as an agent or stockbroker or otherwise in a specific casualty company. Or he may be asked the broad question whether he is interested in any insurance company insuring against liability for negligence ... But counsel must take pains to propound such questions in such a manner as not necessarily to convey the impression that the defendant is in fact so insured.'

*Faris v. Burroughs Adding Mach. Co.*, 48 Idaho 310, 317, 282 P. 72, 74 (1929) (citations from *Arnold* omitted). Our case law is distinctive because it has never found error in allowing a party to examine potential jurors about insurance matters in order to determine whether they are biased against plaintiffs.[3]

In light of the our long established case law, the Skibas' argument above, and the policy reflected in I.R.E. 411, we believe the approach taken in *Sutherlin v. Fenenga*, 111 N.M. 767, 810 P.2d 353, 362 (Ct. App.1991), to be the best resolution of the competing interests noted above. The court there held:

We believe that the proper rule ... is that a party may properly make a good faith inquiry into such issue on voir dire,

---

**3.** In *Clark v. Alloway*, 67 Idaho 32, 170 P.2d 425 (1946), the Court did not reach the issue of whether the trial court abused its discretion in refusing to allow plaintiff's counsel to inquire

whether any of the potential jurors were stockholders in insurance companies because that issue was not adequately addressed in the appellant's brief. 67 Idaho at 39, 170 P.2d at 429.

subject to appropriate limitations imposed by the trial court, and upon a proper showing that members of the prospective jury panel may have been exposed to media accounts concerning allegations about the effect of jury awards on insurance costs.

*Sutherlin*, 810 P.2d at 362.

This rule is consonant with the Texas cases cited to us by the Skibas. The Texas courts have allowed questioning about the "insurance crisis," emphasizing the importance of the plaintiff's right to have an unbiased jury and the difficulty of selecting unbiased witnesses after extensive public discussion of the effect of personal injury suits on insurance premiums rates and the availability of insurance. However, in both of those cases, the court was aware of possible exposure to such advertisements. In *Babcock v. Northwest Memorial Hospital*, the court noted that "[a]t the time of trial, tort reform and the debate concerning the alleged 'liability insurance crisis' and 'lawsuit crisis' were the subject of much attention." 767 S.W.2d 705, 708 (Tex.App. 1988). The same is true in *National County Mut. Fire Ins. Co. v. Howard*, 749 S.W.2d at 621.

While we do not know whether the insurance companies involved here, were among those who have advertised, we do note that any prohibition against comments regarding insurance would be a shield, not a sword. It would be manifestly unfair for insurance companies to use their substantial resources in order to persuade the public through the media that juries should not award or should award less in damages, while protesting that it would be too prejudicial to let the plaintiffs inquire of potential jurors whether the advertisements have biased them against plaintiff suits in general. The insurance companies have injected the issue of the effect of lawsuits on insurance into the public consciousness. Their purpose served by opening the door

to the "insurance crisis" debate, they cannot now expect to slam it shut in the face of plaintiffs who hope to discover the effect of the advertisements on the potential jurors in their case. If the tables were turned in this case, and the plaintiff's bar had launched a media campaign to increase jury awards in Bannock County by showing in graphic detail various personal injuries and the long term effect of same on the victims, we are convinced that the defendants in this case would demand the opportunity to determine whether any of the potential jurors had been biased against defendants in general by the exposure.

The approach we announce today is also consistent with our prior case law which balances the inherent possibility of prejudice from evidence of insurance with the recognition that such evidence is relevant to show bias. Trial courts can minimize any prejudice to the defendants by offering to give a cautionary instruction based on Idaho Civil Pattern Jury Instruction 101.[4] Historically this Court has expressed its confidence that juries will follow such a cautionary instruction. *Barry v. Arrow Transp. Co.*, 83 Idaho 41, 46, 358 P.2d 1041, 1044–45 (1960); *Burns v. Getty*, 53 Idaho 347, 352–54, 24 P.2d 31, 32–33 (1933).

■ Although we hold that, under the proper circumstances and subject to the limitations of the trial court, a party may inquire whether jurors have been exposed to media accounts of a "medical malpractice crisis" or an "insurance crisis," we conclude that there has not been a sufficient showing here that the potential jurors may have been exposed to such advertisements. Here, unlike in the Texas cases, there is no evidence to show that there had been advertisements from insurance companies in Bannock County.

As remand is necessary because of our resolution of the standard of care issue, the

---

4. I.D.J.I. 101 could be easily modified to fit this type of case. For example:

No insurance company is a party to this action. You must refrain from any inference, speculation or discussion about insurance.

Any questions that were asked in the examination of prospective jurors about an interest

in a casualty insurance company [or about exposure to certain advertisements from insurance companies] were for the sole purpose of discovering the possibility of a biased viewpoint.

The modified portion of the instruction is in brackets and in boldface type.

plaintiffs will have another opportunity to demonstrate to the court that potential jury members may have been exposed to such advertisements. If such a showing is made, the trial court should allow the plaintiffs to voir dire about the effect of the advertisements, if any, on the venire members.

For the reasons above, we reverse and remand for a new trial. Because of our resolution of the local standard of care issue, we need not reach the other issues raised by the appellants and cross-appellant. Costs to plaintiffs-appellants.

JOHNSON and McDEVITT, JJ., concur.

BISTLINE, Justice, specially concurring.

I

Chief Justice Bakes in dissent claims that there was not a sufficient foundation for Dr. Friedman's testimony because "[a] careful review of Dr. Friedman's testimony ... demonstrates that Dr. Friedman did not establish the Handbook of Standards for ob-gyn doctors required either a biomedical profile or an ultrasound in cases of suspected macrosomia."

In support of that statement, it is argued that "there was never any testimony ... that the Handbook of Standards even addressed biophysical profiles." However, Dr. Rufi stated that the local standard of care, with one minor exception, was the same as the national standard of care. He also testified that the national standard was set out in the Handbook.

Q. Do you believe you have knowledge of what the local standard of practice for board certified obstetricians and gynecologists was in 1985 in Pocatello?

A. Yes.

Q. You obviously got that by practicing here.

A. Right.

Q. And you are also a board certified specialist and you are supposed to be familiar with the national standards of people who have your certification.

A. Yes.

Q. And are you?

A. Yes.

. . . .

Q. In relation to the local standard of practice for board certified obstetricians as it existed at that time frame ... was that standard in any respect lower in this community than it was for board certified physicians practicing elsewhere, i.e., using the national standards?

A. No.

Q. Did you have occasion from time to time to look at the handbook of suggested practices which was presented and published by the National College—

A. American College.

Q. Thank you. Are you familiar with the Handbook of Standards by the American College of Obstetricians and Gynecologists?

A. Yes.

Q. And is that reflective of what the standard of practice was in this community in 1985?

A. Yes.

Rufi Deposition, 6–8.

Dr. Friedman testified that the national standards are the ones set forth in the Handbook.

Q. Doctor, are there standards, written standards of any type which would have in 1985 applied to the standard of practice for Dr. Rush's behavior as a board certified obstetrician?

A. Yes.

Q. And what are those standards, sir?

A. There are a number of different published standards. The one most commonly referred to are a list of standards published by the American College of Obstetricians and Gynecologic Services. This is the Sixth Edition dated 1985 and was published and distributed in April of 1985 to all members of the college, all fellows of the American College of Obstetricians and Gynecologists, and to obstetric services in the country.[5]

5. Presumably Dr. Friedman was well acquainted with the American College Standards as he was chairman of its committee on Fetal and Perinatal Medicine and was featured in

. . . .

Q. Dr. Friedman, what facts did you obtain from Dr. Rufi's deposition which have assisted you in coming to conclusions about the local standard of practice?

A. He specifically stated that he knew the local standards for Pocatello and that he knew the national standards and that basically the local standards were the national standards, and they went by the American College of Obstetricians and Gynecologists standards. Those guidelines were the guidelines for local practice. . . .

Tr., Vol. VII, 1101–02, 1112.

Dr. Friedman's testimony that Dr. Rush's treatment fell below the standard of care by failing to conduct a biophysical profile, established that Dr. Rush did not follow the procedures set out in the Handbook. And if Dr. Rush did not follow the procedures set forth in the Handbook regarding biophysical profiles, then he was not following the local standard of care in Pocatello in 1985, as those standards then existed according to Dr. Rufi's testimony.

Likewise, when Dr. Friedman testified that Dr. Rush fell below the standard of care by failing to use ultrasound, he was referring to the standards as embodied in the Handbook, which Dr. Rufi testified set forth the standard of care in Pocatello in 1985, with one irrelevant exception.

The Chief Justice is entitled to his view that the evidence was insufficient to establish that ultrasound or biophysical testing was required under the then applicable national standard of care. However, such testimony read in context establishes that biophysical testing and ultrasound were part of the national standard of care in 1985. And, if they were reflection of the national standard of care, it follows that they were also part of the local standard of care.

II

Justice Boyle's dissent takes a different approach by arguing that Dr. Rufi's deposi-

tion does not support the conclusion that ultrasound was part of the local standard of care, although he apparently concedes it was part of the national standard of care.

It is first argued that other doctors in Pocatello, specifically Dr. DeSano and Dr. Rush, did not believe the use of ultrasound was part of the local standard of care. Of course, it is not surprising that Dr. Rush, being one of the defendants, would deny he gave substandard care to Zofia and Stephanie. Little, if any, weight needs to be given to his opinion because the legislature could not have intended to allow Dr. Rush to defeat the claim against him by his own self-serving testimony. Such a result would be absurd, to say the least!

As to Dr. DeSano's statement, Dr. Friedman noted that it did not make any sense:

He indicated to me that the use of ultrasound was available and being used for assessing gestational age and fetal size, but specifically did not say that it was being used for macrosomic infants. And I have already testified yesterday that that didn't make any sense to me since the technique for fetal size was the technique for fetal size regardless of the size of the baby, it's the same technique.

Tr., Vol. VII, 1177.

The doctor was correctly observing that it is nonsense to say that ultrasound was not being used to determine whether a fetus was macrosomic if ultrasound was being used to assess fetal size. Macrosomia is nothing more than very large fetal size which would be discovered during an ultrasound to assess fetal size. Dr. Friedman later observed that if ultrasound had been used to assess fetal size in this case, it would probably have been discovered that Stephanie was a macrosomic baby and steps could have been taken to avoid the shoulder dystocia during the delivery. Dr. Rufi also testified that ultrasound was one method of determining whether a baby is macrosomic. If anything, when Dr. DeSano said that ultrasound was being used to assess fetal size, he was supporting Dr. Friedman's opinion that the use of ultra-

videotapes used by the College to educate other members of the profession.

sound was part of the local standard of care.

More importantly, the fact that there is disagreement within the local medical community as to the particulars of the local standard of care does not mean an adequate foundation cannot be laid for an expert's opinion as to what s/he thinks the standard is. A fair examination of Dr. Rufi's deposition establishes a foundation for Dr. Friedman's opinion.

It is next contended that Dr. Rufi's testimony is "not time and site specific as required in *Gubler v. Boe, . . . .*" because 1) it was not clear whether the local ultrasound operators were giving estimated weights in 1985, 2) that Dr. Rufi only testified that ultrasound began to be used in the "early eighties," and 3) he did not answer the question of when it became the standard in Pocatello.

Although Dr. Rufi originally said he was not sure whether he was getting estimated weights in 1985, he later modified his testimony.

Q. As far as you could tell, your people in Pocatello were keeping up with what was being done elsewhere with the use of ultrasound in measuring fetal weights.

A. As far as the time when it was available and not available, that's not clear in my mind. But they did provide that for us and I don't recall at this point what point it was available and wasn't available.

Q. Was it shortly after you [moved to Pocatello in 1979]?

A. I don't recall.

Q. Late seventies, early eighties?

A. It might have been more like early eighties.

Q. Did you routinely ultrasound gestationally diabetic patients?

A. Yes.

Q. Would it be not in accordance with good practice not to have done that?

A. I would think so, yes.

Rufi Deposition, 34–35.

This testimony establishes that Dr. Rufi was using ultrasound to determine fetal weight by 1985, by anyone's standards the "mid-eighties." Additionally it shows the failure to do so was not good practice in Pocatello at that time, particularly with gestationally diabetic patients like Zofia Skiba. Gestationally diabetic women are more likely to have big babies and big babies are prone to shoulder dystocia. Dr. Rufi's testimony is corroborated by Dr. DeSano who told Dr. Friedman that ultrasound was available and being used for assessing gestational age and fetal size in 1985.

But even if we assume that Pocatello ultrasound operators were not giving weights as late as 1985, Dr. Rufi also testified he would have sent a patient to Salt Lake City if he suspected the fetus had congenital abnormalities that local ultrasonographers were not competent to assess.

Q. Now, can you tell me what kind of information you might want to seek through the use of an ultrasound if you had a patient you regarded as high risk? And I am now speaking of the '85 time frame.

A. Well, it would be initially important to establish a due date or at least reassure us that the due dates are accurate.

Q. Why is that important?

A. A high risk pregnancy might have to be terminated for one reason or another, and it would be very important to know the dates accurately and to know the chances for the fetus if you had to terminate a pregnancy early.

. . . .

Q. Now . . . are there any other reasons why you think its helpful to do ultrasound on high risk mothers?

A. Yes, and in my own office I did not assess congenital abnormalities except for gross abnormalities of the skull or the chest or heart or whatever, but to thoroughly assess the genetic or the congenital anomaly problem it would require a better machine and more expertise.

Q. Any other reasons, sir?

. . . .

A. Well, that would be the main reason, is to establish dates, to evaluate the fe-

tus and reassure the patient and me that the pregnancy was normal and it was progressing normally.

Q. You had equal confidence in the local ultrasonographer as you did in those people in Salt Lake City?

A. Yes.

Q. And if you didn't have that confidence, you would have referred the patients to Salt Lake City.

A. That's right.

Rufi Deposition, 21–23. Later in the deposition, the doctor said:

Q. And if you had any question about [the local ultrasound operators'] competence in measuring fetal weights in '85 and you were interested in the subject, you could clearly have sent the patient to Salt Lake.

A. Yes.

Rufi Deposition, 24.

So, even if accurate, the observation that Pocatello ultrasound operators may not have been giving fetal weights in 1985 does not show it was not the local standard of practice to have patients travel to Salt Lake City in order to have that done. Dr. Rufi's testimony shows the opposite. In either case, Dr. Rufi's testimony provides sufficient foundation for Dr. Friedman's opinion that Dr. Rush violated the local standard of care by failing to order an ultrasound, whether that test would have been done in Pocatello or Salt Lake City.

### III

To the extent that the evidence as to the local standard of care was in conflict, that is a question of the weight, not the admissibility of the evidence. It was for the jury to resolve the question of the credibility of the witnesses who testified relative to a local standard of care. It very well may be that the jury would have decided to believe the testimony of the defense experts over the testimony of Dr. Friedman. That is their right. But it is also the party's right to have the jury hear all the competent evidence before making their decision, instead of having the district court decide for them that one doctor's testimony is better than another's.

BAKES, Chief Justice, dissenting:

The Court concludes that the trial court erred in excluding the testimony of Dr. Friedman, appellants' expert witness. The trial court found that he had not established that he was adequately familiar with the applicable standard of health care practice in the community of Pocatello, Idaho, and therefore excluded Friedman's testimony.

Unlike a fact witness, which is one who has personal knowledge concerning a matter relevant to the issue being tried, our cases have historically held that a trial court has much broader discretion in determining whether or not to permit an expert witness to render an opinion. *Lowe v. Skaggs Safeway Stores, Inc.*, 49 Idaho 48, 57, 286 P. 616, 618 (1930) ("The qualifications of a witness to testify as an expert is a matter largely within the discretion of the trial court, and its rulings will not be reversed unless there has been an abuse of that discretion."); *State v. Lowe*, 50 Idaho 96, 102, 294 P. 339, 341 (1930) ("[T]esting the knowledge or experience of such [expert] witness to qualify him is for the court."); *State v. Joblin*, 107 Idaho 351, 355, 689 P.2d 767, 771 (1984) ("[T]he competency of a witness to testify concerning a particular matter is for the trial judge to determine ... [and] ... will not be set aside absent an abuse of discretion.").

The majority opinion acknowledges that the trial court has discretion concerning whether to permit a witness to render an expert opinion. *Ante* at 856–859. However, the majority reverses without making the abuse of discretion analysis which this Court has said that we must do in order to determine whether the trial court has abused its discretion. *Sun Valley Shopping Center, Inc. v. Idaho Power Co.*, 119 Idaho 87, 803 P.2d 993 (1991). After reciting the trial court's decision to exclude Dr. Friedman's testimony, the Court merely states, "We are not persuaded," as though the decision was up to us. However, the decision was the trial court's to make. In the *Sun Valley* case we said that, "Our

inquiry is: (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason." 119 Idaho at 88, 803 P.2d at 994. The majority has not made the abuse of discretion analysis set out in the *Sun Valley Shopping Center* case.

Relying on *Buck v. St. Clair*, 108 Idaho 743, 702 P.2d 781 (1985), the majority makes essentially a trial court analysis and concludes that Dr. Friedman made an adequate determination that the local standard of care did not deviate from the national standard of care, and therefore, Dr. Friedman possessed actual knowledge of the applicable local community standard required by I.C. § 6–1012. The Court then holds that "the trial court erred in striking Friedman's testimony about the use of biomedical profiles and ultrasound." *Ante* at 858–859. However, the record supports the trial court, not the majority's analysis.

In an attempt to determine what the community standard of care was, Dr. Friedman stated that he reviewed the depositions of the defendant Dr. Rush, and the depositions of several nurses. First, it should be patently obvious that the local community standard of care for a board-certified obstetrician-gynecologist cannot be determined by reviewing the depositions of nurses who are not board-certified obstetrician-gynecologists. The case of *Buck v. St. Clair*, 108 Idaho 743, 702 P.2d 781 (1985), relied on by the majority, specifically states that. As to the deposition of Dr. Rush, he specifically denied that the community standard of care required the use of biomedical profiles and ultrasound. There is nothing in Dr. Rush's deposition, and the majority opinion does not point to anything in his deposition, which would support the majority's conclusion that the failure to do a "biomedical profile" or an "ultrasound" violated the community standard of care.

Next, the majority relies on the fact that Dr. Friedman testified that he "spoke" with another board-certified ob-gyn, Dr. DeSano, who was practicing in Pocatello at the same time Stephanie was born. The Court's opinion does not state what they "spoke" about. That is because Dr. Friedman did not testify as to what he "spoke" to Dr. DeSano about. The only testimony regarding the content of the conversation which he had with Dr. DeSano came in the cross examination of Dr. Friedman by defense counsel in which Friedman acknowledged that he never asked Dr. DeSano about biophysical profiles:

Q. And your purpose in contacting Dr. DeSano was to determine whether the standards in Pocatello were the same as the national standards, wasn't it?

A. That's correct.

Q. And generally you concluded based on that conversation with Dr. DeSano that *many* of the standards were the same, didn't you?

A. Yes, sir.

Q. It's true, isn't it, though, doctor, that Dr. DeSano did not tell you that your recommendation for a biophysical profile was being done in Pocatello in 1984 and 1985, did he?

A. Correct.

Q. You didn't even ask him about that, did you?

A. Correct.

(Emphasis supplied.)

Dr. Friedman never did testify affirmatively as to what he "spoke" to Dr. DeSano about, except to admit on cross examination that he never asked Dr. DeSano about biophysical profiles. Therefore, the statement in the majority opinion that Dr. Friedman "spoke" to Dr. DeSano does not establish that he became familiar with the community standard of care in Pocatello, Idaho. In fact it establishes just the contrary because it negates any conversation regarding the local community standard, particularly regarding biophysical profiles.

As the final basis for the majority's claim that Dr. Friedman had adequately determined what the local community standard of care was, the majority points to the fact

that Dr. Friedman testified that he reviewed the deposition of Dr. Rufi. The majority finds that as the result of that review Dr. Friedman was qualified to give his opinion that Rush acted below the prevailing local standard of care for board certified ob-gyns because he failed to conduct a biomedical profile or use ultrasound to determine fetal size. *Ante* at 858. The Court's opinion quotes from Dr. Rufi's deposition in which he stated that he was familiar with the Handbook of Standards by the American College of Obstetricians and Gynecologists, and that the handbook was "reflective of what the standard of practice was in this community [Pocatello] in 1985." The majority concludes that, because "Friedman testified that he was also familiar with the Handbook of Standards," Friedman was qualified to testify that "Rush acted below the prevailing national standard of care for board certified ob-gyns because he failed to conduct a biomedical profile or use ultrasound to determine fetal size." *Ante* at 858. However, there was not one word of testimony from Dr. Friedman that the Handbook of Standards required a biomedical profile. The Handbook of Standards itself was never introduced as evidence in the case. Therefore, the mere fact that Dr. Rufi, in his deposition, stated that the Handbook of Standards was "reflective of what the standard of practice was in this community in 1985," did not establish anything with regard to biophysical profiles because there was never any testimony from Dr. Friedman or anyone else that the Handbook of Standards even addressed biophysical profiles. All of the other expert witnesses who testified stated that biophysical profiles were not part of the local standard of practice in Pocatello, Idaho, in 1985.

The record does not support the majority's conclusion that Dr. Friedman was sufficiently qualified to testify concerning the local community standard of care regarding the use of ultrasound. The only mention which Dr. Friedman made in his testimony regarding ultrasound and the Handbook of Standards consists of two short comments. After discussing at some length what the Handbook of Standards required of a hospital regarding Caesarean sections, the following examination of Dr. Friedman took place:

Q. Doctor, I think you are reading something on another subject in there. Are there any other aspects of those rules which you feel were violated by any defendant in this case?

A. There is another reference on page 30 to the fact that obstetric services caring for high risk patients, such as Mrs. Skiba, should be equipped to provide ultrasonography during labor and on a 24–hour basis.

Q. But I think there is evidence that the hospital had an ultrasound facility, which could have been used but wasn't.

A. Correct.

While Dr. Friedman does testify to a reference on page 30 of the handbook that "obstetric services" should be equipped to provide ultrasonography during labor and that the hospital was equipped with an ultrasound facility, Dr. Friedman does not state whether page 30 of the handbook imposed any obligation or standard on an ob-gyn doctor to perform an ultrasound or, if so, under what conditions. He only states, "There is another reference on page 30 to the fact that obstetric services caring for high risk patients, such as Mrs. Skiba, should be equipped to provide ultrasonography during labor and on a 24–hour basis."

In his cross examination, Dr. Friedman acknowledged that he was told by both Dr. DeSano and Dr. Rush that ultrasounds for the purpose of determining fetal weight in cases of suspected macrosomia were not being done as part of the local standard of care in Pocatello, Idaho. That testimony was as follows:

Q. And isn't it true, also, doctor that Dr. DeSano told you at the time you talked to him on the telephone that in Pocatello, Idaho, in 1984 and 1985 ultrasounds for the purpose of determining fetal weight in cases of suspected macrosomia were not being done as part of the standard of care; isn't that correct?

A. He indicated to me that the use of ultrasound was available and being used

for assessing gestational age and fetal size, but specifically did not say that it was being used for macrosomic infants. And I have already testified yesterday to the effect that that didn't make any sense to me since the technique for fetal size was the technique for fetal size regardless of the size of the baby, it's the same technique.

Q. So he told you that if one suspected a macrosomic baby, it would not be the standard of care in Pocatello, Idaho, to do an ultrasound, didn't he?

A. No, he indicated that it was not being used, he didn't say it could not be used.

Q. No, I didn't ask you that question. I said did he tell you that it was not the standard of care in 1984 and 1985 to use ultrasound for the purpose of determining fetal size with regard to an assessment for macrosomia?

A. I have already indicated that is what he said, yes.

Q. And Dr. Rush said that same thing in his deposition, didn't he?

A. Correct.

Q. And Dr. Rufi said it was not routinely done, didn't he?

A. He said it was being done under certain circumstances.

A careful review of Dr. Friedman's testimony, which the trial court made before ruling on his motion to strike his testimony, demonstrates that Dr. Friedman did not establish that the Handbook of Standards for ob-gyn certified doctors required either a biophysical profile or an ultrasound in cases of suspected macrosomia. Dr. Friedman acknowledged on cross examination that Dr. DeSano told him personally on the phone, and Dr. Rush testified in his deposition, that ultrasounds for the purpose of determining fetal weight in cases of suspected macrosomia were not being done as part of the standard of care in Pocatello, Idaho, in 1985.

The trial court had the benefit of personally evaluating Friedman as a witness, and carefully reviewed both his testimony and the deposition testimony of Dr. Rufi and Dr. Rush before he exercised his discretion and concluded that he would not allow the expert opinion testimony of Dr. Friedman because he was not adequately familiar with the local standard of care. Our cases have all held that the trial court is in the best position to judge whether or not to permit an expert witness to render an opinion, considering all the factors in the case. I.R.E. 702 states that the trial court must determine whether such opinion evidence will "assist the trier of fact to understand the evidence or determine a fact in issue." That role is uniquely one for the trial court, not this Court. The Court today confuses the role of this Court under the *Sun Valley* case, and the role of the trial court under I.R.E. 702. *State v. Joblin*, 107 Idaho 351, 689 P.2d 767 (1984); *Lowe v. Skaggs Safeway Stores, Inc.*, 49 Idaho 48, 57, 286 P. 616, 618 (1930) ("The qualifications of a witness to testify as an expert is a matter largely within the discretion of the trial court, and its rulings will not be reversed unless there has been an abuse of that discretion."). Our cases state that we will not presume error on appeal. *See Rohr v. Rohr*, 118 Idaho 689, 800 P.2d 85 (1990); *Carpenter v. Double R Cattle Co., Inc.*, 108 Idaho 602, 701 P.2d 222 (1985); *Rutter v. McLaughlin*, 101 Idaho 292, 612 P.2d 135 (1980). The majority, having made no abuse of discretion analysis as set out in our *Sun Valley* case, should apply our longstanding rule that no error will be presumed by the trial court. *Rohr v. Rohr supra*. The Court errs in reversing the trial court's ruling and the jury's verdict.

As to Part II of the Court's opinion, which states that the trial court should permit *voir dire* examination about the effect of insurance company advertisements regarding the so-called "medical malpractice crisis," the Court's opinion acknowledges that, "There has not been a sufficient showing here that the potential jurors may have been exposed to such advertisements." *Ante* at 859. If there is nothing in the record to show such advertisements in this case, why is the Court pronouncing on an issue which does not exist in this case? Part II of the Court's opinion is unfortunate *dicta*.

BOYLE, Justice, dissenting.

I agree with much that is said in the majority opinion about how the standard of care is to be determined. However, after a careful review of the record in light of our existing case law, I am of the opinion that the district court did not err in holding that adequate foundation for Dr. Friedman's testimony was not laid.

The dispositive issue in this case is whether the standard of care in Pocatello in 1985 included the use of ultrasound technology to determine fetal weight and macrosomia in certain high risk pregnancies. At trial Dr. Friedman testified that in reliance on a telephone conversation he had with Dr. DeSano and the depositions of Dr. Rush and Dr. Rufi, he determined that the "standard of care was for all practical purposes the same here [in Pocatello] as it was in the rest of the country in 1985." R.Vol. VI at 949–50.

Normally, this would be more than adequate to qualify a medical expert under our statutes and cases. However, it was subsequently determined at trial that Dr. Friedman's testimony as to the standard was inaccurate. Initially, Dr. Friedman relied on his telephone conversation with Dr. DeSano to establish the standard of care in Pocatello in 1985. However, upon cross examination Dr. Friedman acknowledged he had been advised in the familiarization process that the use of ultrasound technology to determine fetal weight was not the standard of care in Pocatello at that time. The key portion of Dr. Friedman's testimony was as follows:

Q. No, I didn't ask you that question. I said *did he [Dr. DeSano] tell you that it was not the standard of care in 1984 and 1985 to use ultrasound for* the purpose of *determining fetal size with regard to* an assessment for *macrosomia?*

A. I have already indicated *that is what he said, yes.*

Q. And *Dr. Rush said that same thing* in his deposition, didn't he?

A. Correct.

Q. And *Dr. Rufi said it was not routinely done,* didn't he?

A. He said it was being done under certain circumstances.

R.Vol. VII at 1177–78. (Emphasis added.)

Moreover, in the deposition of Dr. Rufi, relied upon by Dr. Friedman for foundational purposes, it is stated that as of 1985, "[i]t's not clear in my mind that they [the ultrasound operators] were actually giving us estimated weights at that time." Dep. of Dr. Rufi at 32. Dr. Rufi also stated in his deposition that he did not know when fetal weights *began* to be determined by ultrasound in Pocatello. The best estimate he could give was that they began in the "early eighties." The problem with Dr. Rufi's statement is that it is not *time* and *site* specific as required in *Gubler v. Boe,* 120 Idaho 294, 815 P.2d 1034 (1991). More importantly, the evidence in the record does not begin to answer the question of when ultrasound technology for this purpose became the "standard" in Pocatello. At most, the evidence in the record merely approximates a time frame within the early 1980's when the technology was first applied and then only, according to Dr. Rufi, "under certain circumstances."

Admirably, the trial court did not merely rely upon the ambiguity in Dr. Rufi's deposition to strike the testimony of Dr. Friedman. Rather, the trial court properly attempted to assess and determine whether there was a deviation in Pocatello in 1985 from the national standard of care regarding the use of ultrasound technology to determine fetal macrosomia. After the defense had rested its case, the issue of foundation for Dr. Friedman's expert testimony was put at issue. As a result, the trial court gave plaintiffs permission to call Dr. Rufi as a witness to clear up the ambiguity contained in his deposition. Plaintiffs chose not to call Dr. Rufi.

Because Dr. Rufi's testimony was ambiguous as to time, I am reluctantly constrained to conclude that the trial court was within its discretion in determining that neither the deposition of Dr. Rufi nor the telephone conversation with Dr. DeSano laid a proper foundation for the standard of care in Pocatello in 1985. Accord-

ingly, unless we ignore the requirements of I.C. §§ 6–1012, 6–1013, and our prior cases, the only valid legal conclusion is that the testimony of Dr. Friedman was without adequate foundation.

In summary, the record demonstrates that the use of ultrasound technology to determine fetal weight and macrosomia does not appear to have been the standard of care in Pocatello in 1985. In my view, the trial court did not abuse its discretion in ruling that Dr. Friedman's testimony lacked proper foundation. Accordingly, I respectfully dissent.